SMITH PREMIER TYPEWRITER COMPANY V. ELISHA H. MAYHEW ET AL.

FILED JUNE 4, 1902.   No. 11,881.

Commissioner's opinion, Department No. 2.

1. Assignment of Error: ADMISSION OF IMPROPER EVIDENCE: CASE TRIED TO COURT. In a case tried to the court without a jury an assignment of error based on the admission of improper evidence will not be considered, because of the rule that the admission of such evidence is not in itself a ground for reversal. *Whipple v. Fowler*, 41 Nebr., 675, 681; *Ward v. Parlin*, 30 Nebr., 376.

2. Finding of Court: QUESTION OF FACT: CONFLICTING EVIDENCE. The finding of the court upon questions of fact is entitled to the same weight and consideration as the verdict of a jury. Where such finding is based upon conflicting evidence, and upon a careful examination of the whole record we are unable to say that the finding is clearly wrong, it will not be set aside.

3. Promissory Note: CONSIDERATION: SUPPRESSION OF CRIMINAL PROSECUTION. If the consideration for the giving of a note is the suppression of a criminal prosecution, the transaction is illegal and void, and no recovery can be had thereon.

4. ——: ——: ——: PROMISE NOT TO INSTITUTE. It is not material in such a case that no criminal prosecution was actually commenced. A promise not to institute a prosecution is as illegal a consideration as the dismissal of a prosecution already instituted.

ERROR from the district court for Douglas county. Tried below before SLABAUGH, J. *Affirmed.*

*Baldrige & De Bord,* for plaintiff in error.

*W. A. Foster* and *J. J. Boucher, contra.*

BARNES, C.

The plaintiff commenced an action in the district court of Douglas county by filing its petition upon a promissory note, of which the following is a copy:

"$1,000          OMAHA, NEBR., June 7, 1894.

"Six months after date we jointly and severally promise to pay to the Smith Premier Typewriter Company, One Thousand Dollars at Omaha, Nebr., value received, with interest at the rate of seven per cent. per annum from date until paid.

(Signed)       "E. H. Mayhew, J. J. Boucher, J. T. Daily, F. F. Roose, M.,H. Hoerner, Frank E. Moores, Rudolph Beul, J. W. Cady, H. A. Porten, J. W. Malone, Frank E. Hartigan, M. Wulpi, T. B. Minahan."

Summons was issued and served upon a part of the signers of said note, to wit, J. J. Boucher, Franklin F. Roose, Mel H. Hoerner, Frank E. Moores, John W. Cady, John W. Malone, Meinrod Wulpi and John T. Daily. No summons was ever served upon any of the other defendants, and there was no appearance in the case except by those last above named. The petition was in the usual form, and the defendants who were served appeared and filed an answer, in which several defenses were pleaded, only one of which concerns us in this inquiry, and is as follows:

"For a further defense in and to said action these defendants allege that on or about the first day of June, 1894, and for several years prior thereto, the above-named defendant, Elisha H. Mayhew, was in the employ of the said plaintiff in the city of Omaha, said county, and state, having full and exclusive charge of the business of said plaintiff in the sale of its typewriters and the collection and receipt of money due to it on account of such sales; that on or about said June 1, 1894, it was discovered that Mayhew had embezzled the money of the plaintiff com-

pany, and said plaintiff represented to these defendants that said Mayhew had appropriated to his own use, without the knowledge or authority of said plaintiff, and had embezzled from said plaintiff the sum of about $1,000; and said plaintiff further represented to these defendants that it was about to begin criminal proceedings against said Mayhew under the laws of the state of Nebraska to punish said Mayhew on account of and because of said embezzlement of said $1,000, but that it, the said plaintiff, would refrain from such prosecution and would not prosecute said Mayhew criminally and would take no action criminally, nor allow any action criminally to be taken against said Mayhew if these defendants would make, execute and deliver to it their promissory note in a sum equal to the amount embezzled by said Mayhew, due six months after date with interest thereon at the rate of seven per cent. per annum from date until paid. These defendants further allege that in pursuance of said proposition made by said plaintiff to defendants herein that said plaintiff would refrain from criminally prosecuting said Mayhew, and would not allow said Mayhew to be criminally prosecuted, and for no other purpose whatever, and for no other consideration whatever these defendants made, executed and delivered to plaintiff the note set out in plaintiff's petition. Defendants further allege that on the date of the delivery and at the time of the delivery of said note to plaintiff said plaintiff stated and represented to these defendants that the amount appropriated and embezzled by said Mayhew was the sum of $931.56, and thereupon said plaintiff indorsed upon said note as of said date, the sum of $68.44."

It was further alleged in the answer that before the giving of the said note the said Mayhew had indorsed and delivered to the plaintiff a mortgage upon certain property in Council Bluffs, Iowa, for $1,000; and that it was agreed that the same should be held by the plaintiff, and, in case defendants were required to pay the note in suit herein, said note and mortgage should be turned over to them as

an indemnity for such payment. It was further alleged that the note and mortgage upon the Council Bluffs property had been collected by plaintiff, and that the note in suit had been paid thereby, and should be ordered canceled and delivered up to the defendants. To this answer there was the proper reply, and upon the issues thus joined the cause was tried to the court, a jury having been waived in open court by both parties. The court, at the conclusion of the trial, found against the defendants upon the defense of payment, and in fact upon all of the issues, except the one raised by that portion of the answer above quoted. Upon that question the court found that the note in suit was signed by the defendants as sureties for Mayhew, for the consideration and as alleged therein; that the same was illegal and void, and upon such finding dismissed the action as to all of the defendants herein. Plaintiff filed a motion for a new trial, which was overruled. Thereupon it brought the case to this court upon petition in error.

1. It is contended by plaintiff in error that the court erred in receiving certain evidence on the trial of this cause. In a case tried to a court without a jury the admission of improper evidence is not in itself a ground for reversal. This rule is so well established in this state that it is unnecessary to cite authorities in support of it. This being the case, we are not required to consider this assignment of error. It will be presumed that the trial court only considered such evidence as was competent and proper to be considered by him. *Whipple v. Fowler,* 41 Nebr., 675, 681; *Ward v. Parlin,* 30 Nebr., 376.

2. As we view this case there is but one question before us for our consideration, which is, is the evidence sufficient to sustain the finding and judgment of the trial court? and we will now proceed to consider that question. The following are the undisputed facts as shown by the record: In the year 1891 the plaintiff established an agency in the city of Omaha for the sale of its typewriter machines and supplies, and placed the defendant Mayhew in charge thereof, with full power and authority to sell its machines

and supplies and collect the moneys due therefor; that Mayhew continued in charge of such agency and was the agent of the plaintiff from the time it established its said business until about the 7th of June, 1894; that he had built up a large and successful business, and theretofore had been the trusted employee of the plaintiff. Sometime in May, 1894, the auditor of the plaintiff visited Omaha and checked up Mr. Mayhew's books, which showed quite a large amount of past-due claims. Some of these were turned over to an attorney for collection, and after he left Mayhew ordered them turned back. to himself. This fact coming to the knowledge of plaintiff, it sent its auditor, one Edwin McMurchy, to Omaha about the last days of May; who, when he reached the city, found Mayhew absent in the country. McMurchy immediately took possession of Mayhew's books, commenced an examination of them, visited certain of Mayhew's customers in Omaha, and thus ascertained before Mayhew returned that he was short in his accounts. He telegraphed Mayhew to come home, and continued his investigation. By the time Mayhew returned McMurchy discovered that he had converted to his own use certain sums of money belonging to the plaintiff, amounting to about $300 or $400. When Mayhew came into the office McMurchy immediately charged him with being short in his accounts, and with being an embezzler. Mayhew admitted that he was short in his accounts, and told McMurchy he was sorry he came so soon; that if he had remained away a little longer he was prepared to raise the money and pay up the shortage, and that nothing would ever have been known about it. McMurchy immediately called upon Mr. De Bord, the plaintiff's attorney, and consulted him in relation to the matter. It was suggested that perhaps the arrangement that Mayhew had in view, to pay up the shortage, might still answer for that purpose. Thereupon Mayhew and De Bord went that same evening to Council Bluffs, and Mayhew obtained a note for $1,000 and a mortgage securing it, to be executed to him by Leora Sweigert and Amos Sweigert upon their

home in that city. This note and mortgage he immediately assigned to the plaintiff. McMurchy continued his investigation, and the next day told Mayhew that the amount of the shortage was continually increasing, and that he was satisfied that the note and mortgage so assigned to plaintiff was not sufficient to cover the amount of the shortage that the books would show when his investigation was finally completed. He demanded and insisted on having security to double the amount of the defalcation. Thereupon Mayhew attempted to raise the money among his friends to pay off the shortage, but was unsuccessful, and he applied to the defendant, Boucher, who was a friend of his, and who belonged to the same order as he did, to assist him. A conversation was had between Boucher, Mayhew and McMurchy, in which it was stated by Boucher that Mayhew's friends were unable to raise the money; and McMurchy was asked if a note signed by Mayhew and a number of his friends would be accepted in place of the money. McMurchy replied that he was taking a different course in this case from that usually taken by the plaintiff in cases of embezzlement; that he would wire the president of the plaintiff and ascertain if such a note would be received. The next day he exhibited a message to Boucher to the effect that plaintiff would receive a note for $1,000, due in six months, with interest at the rate of seven per cent., signed by Mayhew and his friends as security, which security should be approved by Mr. De Bord, in lieu of the money. Thereupon De Bord made out the note, which was signed by Mayhew and Boucher, who took it, and made a canvass among the friends of Mayhew, members of the lodge to which he belonged, in order to obtain additional signatures. It is established beyond question that Boucher, at the time he procured the signatures of each of the other defendants, informed them that the plaintiff had discovered that Mayhew was short in his accounts to the amount of about $1,000; that McMurchy, acting for the plaintiff, had told him (Boucher) in Mayhew's presence that, in case the money was not paid, or the security

given within a few days, the plaintiff would prosecute Mayhew for embezzlement, and send him to the penitentiary; that if the money was paid, or the note in question signed and delivered, then no prosecution would be had. Each one of the defendants testified that upon being told these facts by defendant Boucher they signed the note in question for the purpose of preventing such criminal prosecution. It is further shown that none of the defendants owed the plaintiff anything, or had any interest in the transaction whatever, except to assist Mayhew and prevent a criminal prosecution. It was further shown that the fact of the giving of the Council Bluffs mortgage of $1,000 to the plaintiff was made known to the defendants, and each of them, and it is admitted by the plaintiff that it agreed that, if the note in question herein was paid promptly when it became due, it would retain the Council Bluffs mortgage and the defendants should have the benefit of the same for their indemnity. It was further shown that when the investigation which was made at that time was completed so that the plaintiff was ready to receive the note in question, the shortage apparently amounted to $931.56; that thereupon the note was delivered to McMurchy or De Bord, and there was indorsed as a payment thereon the sum of $68.45, so as to make it correspond with the amount of the shortage which had been thus ascertained. It is further shown that when the note became due it was not paid, but was protested, and that thereupon defendant Boucher wrote a letter to the plaintiff, setting forth the facts claimed in the answer of the defendant that the note was given for the sole purpose of preventing the criminal prosecution of Mayhew.

The only point in dispute in this record is whether or not McMurchy told Mayhew, and also told Boucher in Mayhew's presence, that if the note was not given or the money paid within a few days the plaintiff would prosecute Mayhew for embezzlement, and send him to the penitentiary; and, if the matter was thus arranged and settled, no prosecution should be had. The testimony upon this point

is conflicting. Boucher testifies positively to these facts. His evidence is in substance as follows: That Mayhew, the principal on the note, called upon him about May 24, 1894, and stated that he (Mayhew) had ·been found to be short several hundred dollars in his accounts with his employer, the Smith Premier Typewriter Company, and that the auditor of the company had threatened a criminal prosecution unless the amount should be paid forthwith; that on the following day, Mayhew, with McMurchy, the auditor of the company, called upon him, and McMurchy stated that Mayhew was short five or six hundred dollars; that his instructions from the home office were that whenever he found any employee of the company to be short in his accounts to take no risk, and not to delay, but cause arrest and prosecute; that he had wired the president of the company about Mayhew's shortage, and had received a reply to take no chances, but prosecute; that out of friendship for Mayhew he had not followed instructions to prosecute, and would not do so if the amount should be either paid or secured; that unless Mayhew should raise the money at once, he would · have to begin a criminal prosecution against him. The following extracts are from Boucher's testimony:

Q. Was there anything said in that conversation about the company refraining from prosecuting?

A. Yes, sir.

Q. What was it?

A. McMurchy said that unless the amount was paid forthwith, or immediately secured until the money could be procured within a day or two, criminal proceedings would be at once instituted and Mr. Mayhew would be arrested; and that, of course, if the money should be forthwith paid, or the security furnished, that he. would not be arrested and prosecuted.

Q. What was this proposition that he said he would lay before the company?

A. Whether or not the company would accept a ˙note, due in six months or a year, from Mr. Mayhew and his

friends, for the amount of the shortage that should develop.

The witness further testified that he received the note from the attorney of the company, and took it to the other signers, and stated to them, among other things, that Mayhew was short with the company about a thousand dollars; that the company was about to prosecute him, but would refrain from doing so if a note with sufficient signers could be procured; and thereupon the others signed the note. The other defendants testified that these statements were made to them. In answer to a direct question the witness said: "It was expressly stated by Mr. McMurchy upon at least one occasion, and I think upon each and every occasion, when the matter came up, that the company would accept this note and would not prosecute Mr. Mayhew. Mayhew was never prosecuted for embezzling from the company." A letter from the witness to the president of the company, written when the note came due, was received in evidence. In that letter it was stated that the writer and the other signers of the note were induced to sign upon the promise of the company, through McMurchy, that if they should sign, then Mayhew would not be prosecuted. A letter from the president in reply was received in evidence. Therein the writer stated that McMurchy had instructions from the company to prosecute all defaulting employees, but that the company had in this instance instructed him to take a note properly secured instead. On cross-examination of Mr. Boucher, by Mr. De Bord, the following testimony was given:

Q. Did Mr. McMurchy ever promise to you, or say in your hearing, that the consideration of this note was that Mr. Mayhew was not to be prosecuted?

A. He did.

Q. When and where?

A. He said that on the morning after I had submitted to him the proposition of giving a note instead of paying the cash and at the time when he had said that he had received word from the Smith Premier Typewriter Com-

pany that they would accept a six months' note to be approved by you in lieu of the cash.

Q. Where did that occur?

A. In my office.

Boucher's testimony was fully corroborated by the evidence of Mayhew. Mr. Moores, one of the defendants, on cross-examination, testified:

Of course, when I put my name to a piece of paper, if necessary, I expect to make that name good, if possible; but in this case it was done to prevent the Smith Premier Typewriter Company prosecuting Mayhew. I had every confidence to believe that Mr. Mayhew and his friends would pay this amount, and this signing the note was but a temporary step to stop criminal prosecution against him.

The testimony of the other defendants was to the same effect. McMurchy, who testified in the case, denied that he made the statements detailed by Mr. Boucher and Mr. Mayhew. It does appear, however, in McMurchy's testimony, that Mayhew continued to try to interest his friends in the matter, and a proposition was made to Mr. De Bord and himself, in Mr. De Bord's office in the New York Life Building, that certain of Mr. Mayhew's friends would sign a note with him for $1,000, McMurchy said:

I stated at that time that we were acting not in accordance with the plans set forth by the president of the company in cases of embezzlement, and that I would be compelled to communicate with Mr. Smith before I could accept anything of the sort.

Mr. McMurchy further testified in answer to this question:

Did you—In this conversation with Mr. Boucher, was there mentioned between you any reason why the proceedings in the case of shortage in accounts of embezzlement in the Mayhew case should be some different from others?

A. Yes, sir. I think I stated Mr. Mayhew was an old employee of the company, a friend of the Smith boys; that

he was a member of the same lodge that they were.    I think I said to him after the proposition by Mr. Mayhew that some of his lodge friends would help him out.

Mr. McMurchy, on being asked a question by Mr. De Bord, stated:

You advised me that it would be best not to prosecute, and that the settlement as made would be the best thing; that Mayhew was a young man, quite prominent; that he had committed no crime previous to that time, and that circumstances connected with the case were an excuse for his embezzlement.

He further testified, in speaking of Mr. Mayhew, as follows:

At the time he was presented with the accusation that he had embezzled these amounts he stated that he was preparing to pay them, and at all times and all through his conferences with me it was towards his paying up the amount that he had appropriated.

Q. State whether you ever remember of Mr. Mayhew's breaking down, and crying, and begging for leniency?

A. Yes.

Q. He did that several times?

A. Yes, he did that in your presence and in mine.

The court asked McMurchy the following question:

Q. What was the object,—what did you understand at the time, if the note had not been given or security had not been given,—what did you understand would occur?

A. I did not understand anything, for the reason that I would be compelled to follow instructions from Syracuse, from Mr. Smith, in that respect.

It had been previously shown that Mr. McMurchy's instructions from Syracuse or from Mr. Smith were in all cases where there was a shortage to immediately prosecute for embezzlement, and take no chances.

The circumstances in this case are such as to corroborate the testimony of Mr. Boucher. It is proper to observe that Mr. Mayhew had assigned the note and mortgage for $1,000 to plaintiff to pay his shortage, which was then

understood to be less than that amount. He had made restitution in full, so far as was then known. If he was not threatened with a criminal prosecution unless he should procure the note in question, thus securing double the amount of his shortage, and was not promised immunity in case he should do so, why was he breaking down, crying, begging for leniency, and making such strenuous efforts to comply with the plaintiff's demands? If there had been no threat to prosecute Mr. Mayhew, and no agreement to refrain from such prosecution, it is difficult to conceive why, or for what consideration, the note in question was given by these defendants. They were not particularly interested in the transaction. It would have made no difference to them whether Mr. Mayhew paid his debt to the plaintiff or not. Neither of them was in any way financially interested in the matter, nor in any manner security therefor. For want of space we do not feel justified in quoting any more of the testimony. It is apparent that the finding of the trial court was based upon conflicting evidence, and is entitled to the same weight and consideration as the verdict of a jury. After a full examination of the whole record we are unable to say that the finding of the court was clearly wrong, and therefore it will not be disturbed. If the consideration for the giving of a note is the suppression of a criminal prosecution, the transaction is illegal and void, and no recovery can be had thereon. *Buck v. First Nat. Bank,* 27 Mich., 293; Clark, Contracts, 431; Tiedeman, Commercial Paper, 183; *Sumner v. Summers,* 54 Mo., 340; *Roll v. Raguet,* 4 Ohio, 400; *Henderson v. Palmer,* 71 Ill., 579; *Peed v. McKee,* 42 Ia., 689. It is not material in this case that no criminal prosecution was actually commenced. "A promise not to institute a prosecution is as illegal a consideration as the dismissal of a prosecution already instituted." Tiedeman, Commercial Paper, and *Roll v. Raguet, supra.*

The court having found that the plaintiff had threatened to prosecute Mayhew for his shortage and send him to the penitentiary, and agreed that if the shortage was paid or

secured by the giving of the note in question, that no prosecution would be instituted, it follows that the judgment of the court upon such finding, declaring the note in question illegal and void and dismissing this action, was right, and should be affirmed.

For the foregoing reasons we recommend that the judgment of the district court be affirmed.

OLDHAM and POUND, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.