NEBRASKA CENTRAL BUILDING & LOAN ASSOCIATION, APPELLEE, v. GERTRUDE C. MCCANDLESS ET AL., APPELLEES; GRACE E. WAISNER, APPELLANT.

FILED FEBRUARY 20, 1909. No. 15,553.

Mortgages: VALIDITY. M., an attorney at law, was indebted in a considerable sum for money of a client which he had converted to his own use. A representative of that client went to the home of M. in his absence and stated to his wife, who was there alone, that her husband had used large sums of money that belonged to said client, who was also a niece of M., and that, unless she executed a mortgage on her homestead, said representative would forthwith commence "proceedings." M.'s wife was in ill health, nervous, excitable, and unaccustomed to transact any kind of business, and believed and understood from the statements made to her that the proceedings referred to were criminal prosecutions, and she, acting under the pressure of a desire to save her husband, agreed to sign the mortgage. She went that night to

the train to meet her husband, and insisted that he should at once go to his office and with her execute said mortgage. She prevailed, and the instrument was executed. *Held,* That in the light of the facts, notwithstanding she had the benefit of the presence and protection of her husband at and just before the time she signed the mortgage, she was not a free agent in that particular, and as the rights of third persons had not intervened, and she had not received any consideration for signing the mortgage, that a court of equity would not enforce its provisions.

APPEAL from the district court for Gage county: JOHN B. RAPER, JUDGE. *Affirmed.*

*N. K. Griggs, Samuel Rinaker* and *Metz, Sackett & Metz,* for appellant.

*E. N. Kauffman, A. D. McCandless* and *O. E. Kretsinger, contra.*

ROOT, J.

Cross-action to foreclose a mortgage. Defense that the property described in the conveyance was the separate property and homestead of the mortgagor, a married woman, and that said instrument was secured by "force, fraud, terrorism and coercion exerted upon her in the absence of her husband," by an attorney who represented the mortgagee. There was judgment for the defe and the mortgagee, Grace E. Waisner, appeals.

There are some undisputed and many contr facts in the case. The evidence is clear that the ! scribed in the mortgage constitute the homeste separate property of Mrs. McCandless; that sl married woman, and with her husband has occupy property as a homestead for some 15 years last pat the lots are not worth to exceed $2,500 and are bered by a *bona fide* prior mortgage for $800. d Candless is an attorney at law, and preceding th- tion of the contested mortgage, as such lawyer, ceived a large sum of money for his client, Mrs. ay ef, and was owing her on said account an indefinite sum of

money approximating $7,000. The mortgagee had made her home with Mr. McCandless when she was a girl, and was in some degree related to him. Mrs. Waisner, who now resides in Wyoming, sent an attorney from that state to Nebraska to settle with McCandless and collect the debt or procure security for its payment. In December, 1905, said lawyer interviewed McCandless, and they seem to have agreed upon a balance of $7,000 as due Mrs. Waisner. It may be that this sum was subject to a deduction for an attorney's fee, but the record is not clear on this point. The Wyoming attorney was willing to accept in full settlement from McCandless seven of his notes for $500 each, one of which would mature every year for seven years, but insisted that payment thereof should be secured. To this point there is practical agreement in the evidence, but from thence forward the witnesses are in sharp conflict. The Wyoming attorney testified that McCandless said that he owned no property other than his home, and would incumber it to secure said notes if his wife would sign the mortgage, and that he would try and induce her to do so when she returned home; she being away on a visit at the time. The attorney then went to Illinois, and within ten days sent a telegram of inquiry to McCandless, and, upon receipt of an answer that security would not be given, returned at once to Wymore, where McCandless resides, and, not finding that gentleman at home, went to his residence and talked with Mrs. McCandless. The lady was then 55 years of age, in ill health, highly nervous, and totally inexperienced in business affairs. Mr. McCandless had not informed his wife about his transaction with the Wyoming lawyer, and the latter informed her that her husband had used money that belonged to a client; that he was surprised that McCandless had not informed his wife about the arrangement for a mortgage; that he must be insane, or, as the attorney says, "foolish," not to have the mortgage executed, and that, if it was not given, he would at once commence "proceedings." The woman testified that she

understood the word "proceedings" to refer to a criminal prosecution against her husband, whereas the attorney insists that he did not intend to convey that idea, but referred, and intended to refer, to a civil action only, and that neither the woman nor the court would be justified in giving any other construction to the language employed.

In the instant case we are not dealing with legal or lay definitions of a word, but whether this woman understood, and had reasonable ground to believe, it was used with reference to a criminal prosecution. The language used by the attorney indicates a discriminating mind, but one can read between the lines a veiled threat, a purpose to convey a sinister meaning, that he did not intend to content himself with recourse to a civil action to compel her husband to make restitution for the money he had wrongfully and, possibly, criminally converted to his own use. Her future conduct is incompatible with any understanding other than testified to by her. Mr. McCandless returned about 8 o'clock that evening. It was a cold, wet, disagreeable night in January. She had never before in their married life gone to the depot to meet him, and yet this night she appeared there improperly clothed for the street, in a highly excitable and nervous condition, and insisted that the mortgage should be given forthwith. Her husband went with her to his office, where they found the vigilant collector waiting for them. The husband and wife testified that Mr. McCandless did all in his power to dissuade her from signing the mortgage, but that she insisted that it be done, and finally the instrument was executed. The attorney representing Mrs. Waisner testified that during the time he called upon Mrs. McCandless in the afternoon she was cool and collected, perfectly willing to give the mortgage, and remained in the same condition during the conference at the office, and that both husband and wife were satisfied with and desired to execute said instrument. It is undisputed and significant that all parties remained in the office over two hours, a

fact inconsistent with the mere writing of a mortgage and seven notes; all conditions whereof having been agreed upon beforehand. If Mrs. McCandless desired to give the mortgage solely as a matter of justice and for the pecuniary advantage of her husband, she would scarcely have made a trip in the storm and darkness to the depot that night, without regard to her clothing or appearance, or have insisted strenuously, over her husband's objections, that the mortgage be given. Her statement in the office that, "I would not have you arrested or charged with a crime for forty such homes as that," her mental distress at the time and complete prostration the succeeding day, all tend strongly to prove that she was acting under great pressure and the fear that her husband was in imminent danger, and that the mortgage must be given for his protection.

Although the circumstances of this case are unusual, and the woman had the benefit of the presence and protection of her husband at the closing scene of the drama, staged by the representative of Mrs. Waisner, we are not satisfied that the mortgage represents the free consent of the mortgagor. "The consent by which agreements are formed ought to be free. If the consent of any of the contracting parties is extorted by violence, the contract is vicious, * * * and the person whose consent is extorted, or his heirs, may procure it to be annulled by letters of rescission." 1 Pothier (Evans), Obligations, p. 115. And cases may occur where one party to a contract in terror, under threats short of duress, does not act with a free will, and, if it is made to appear to a court of equity that he was not a free agent, that court will protect him. 1 Story, Equity Jurisprudence (13th ed.), sec. 239; Bispham, Principles of Equity (6th ed.), sec. 230. In the instant case the rights of third persons do not intervene, the wife received no consideration whatever for her act, nor has Mrs. Waisner lost anything by the receipt of this mortgage. She may have scaled down her claim against McCandless, but, if it was in consideration of the giving

of the mortgage, she would not be bound by that reduction. As said by Lord Chelmsford in *Williams v. Bayley,* 35 L. J. Ch. (Eng.) 717, in a case quite in point: "A contract to give security for the debt of another, which is a contract without consideration, is, above all things, a contract which should be based upon the free and voluntary agency of the individual who enters into it." In that case a son had forged his father's name to bills which he thereafter discounted. At a meeting attended by the officers of the bank and the father the statement was made by one of the former to the latter: "We do not wish to exercise pressure on you if it can be satisfactorily arranged." No demand was made for security, but the father through his solicitor negotiated with said creditors and ultimately adopted the signatures to the forged bills and gave said bankers title deeds to a colliery owned by him. He also had a considerable deposit in his own name with said bankers. The son soon thereafter absconded and was declared a bankrupt. The bankers refused to honor the father's check against his own deposit, and litigation ensued which involved all features of said transaction. The vice chancellor held that the father was improperly influenced and driven to sign the agreement by his fears, which were worked upon by the appellants *"making him see that they had acquired the power of prosecuting his son."* The decision of the vice chancellor was sustained in the house of lords, wherein it was held that neither a distinct threat to prosecute, nor a promise of immunity to the son, was necessary to deprive the father of the exercise of that free will essential to uphold his contracts of suretyship. *Williams v. Bayley,* 35 L. J. Ch. (Eng.) 717, L. R. 1 H. L. 200, 12 Jur. (n. s.), 875, 14 L. T. 802. In *Lomerson v. Johnston,* 47 N. J. Eq. 312, a creditor of the husband had gone to the latter's wife, and by stating that her husband had been guilty of embezzlement and could be put in jail therefor, but without directly stating that a criminal prosecution would be instituted, secured a mortgage from her upon her separate

property. *Held,* That the instrument was void at her election, because the pressure exerted had destroyed the mortgagor's free agency so that she did not act according to her free will. See, also, *Eadie v. Slimmon,* 26 N. Y. 9, 82 Am. Dec 395; *Bell v. Campbell,* 123 Mo. 1; *Bryant v. Peck & Whipple Co.,* 154 Mass. 460; *Hargreaves v. Korcek,* 44 Neb. 660; *Pride v. Baker,* 64 S. W. (Tenn.) 329.

In the instant case the representative of Mrs. Waisner did not in positive and direct language state that he would cause her husband to be prosecuted if the mortgage was not given, but he first disclosed to her that he possessed the power to institute or cause to have instituted a criminal prosecution against her husband, and then told her that, if the mortgage was not signed, he would commence proceedings against her husband, and thereby excited in her mind extreme apprehension for his safety, and we believe secured the execution of the instrument in suit. We think the district judge who saw and heard all of the witnesses whose evidence appears in the record was justified in concluding, as he did, that the mortgage was secured from Mrs. McCandless by working on her fears, that it was not the result of her free will and voluntary action, and that the mortgagee was not entitled to the assistance of a court of equity to enforce its provisions.

The judgment of the district court therefore is

AFFIRMED.