THEOPHILUS HOELLWORTH, APPELLEE, v. MARY J. McCARTHY, APPELLANT.

FILED FEBRUARY 25, 1913. No. 16,927.

Mortgages: CONTRACT OF MARRIED WOMAN: DURESS. A married woman who involuntarily mortgages her separate estate or homestead to secure an individual indebtedness of her husband may have the lien canceled in a suit to foreclose the mortgage, where she was induced to execute it by mortgagee's threats to imprison her husband for feloniously disposing of mortgaged chattels.

APPEAL from the district court for Greeley county: JAMES N. PAUL, JUDGE. *Affirmed as modified.*

*J. P. Boler, T. J. Doyle* and *J. R. Swain,* for appellant.

*T. P. Lanigan, W. F. Critchfield* and *Lambert, Shotwell & Shotwell, contra.*

ROSE, J.

Plaintiff brought this suit to foreclose a mortgage for $9,230.88 on 720 acres of land in Greeley county. By cross-bill Byers Brothers & Company, defendant, a corporation engaged in the live stock commission business in South Omaha, pleaded a subsequent mortgage on the same property for $12,423.93, and prayed for a foreclosure thereof. In both transactions defendants Patrick H. McCarthy and Mary J. McCarthy, his wife, are mortgagors. From a decree foreclosing both mortgages defendant Mary J. McCarthy has appealed, and will be designated "appellant." Other mortgages aggregating $8,915.80 were pleaded, and foreclosure thereof was properly decreed, but to prevent confusion further reference thereto will be avoided.

A quarter-section of land to which appellant held the fee, and, in addition, an 80-acre tract occupied by her with her husband and ten children as a homestead, were included in the mortgages. Appellant concedes that the other incumbered lands are subject to foreclosure. The question to be determined is whether appellant voluntarily mortgaged her 80-acre homestead and her separate estate of 160 acres. That she signed the mortgages and the notes thereby secured is not disputed. No defect in complying with the forms of the law in regard to acknowledgments appears on the face of the mortgages themselves. Directly stated, the material defenses interposed by appellant are that she was mentally incompetent to incumber her property, and that she was coerced into doing so by threats of mortgagees that her husband would be imprisoned if she failed to execute the mortgages.

The first of the defenses is not established. Appellant understood the transactions, and knew that her acts might deprive her and her offspring of their home. She discussed these matters intelligently with her husband's creditors. She first refused to sign the instruments, and for a time persisted in her refusal without the advice of any one. In

absence of her husband, she left her home after she had been visited there by his creditors and went to the county seat to confer with them. The evidence does not show that she was mentally incompetent when the notes and the mortgages were signed.

It is argued that duress is not properly pleaded in the answer of appellant, and that therefore she is not entitled to relief on that ground. Appellant replies that her answer is sufficient, but, to conform her pleading to her proofs, she tenders here an amendment containing a better plea of duress. It is unnecessary either to discuss the sufficiency of the answer or to determine the right of appellant to amend it in this court, for the following reasons: This is a suit in equity wherein there is no issue to be defined for the guidance of a jury. All parties interested understood that duress was pleaded as a defense, and a large part of more than 600 pages of testimony was directed thereto. To refute testimony tending to show threats, mortgagees cross-examined appellant's witnesses, and in contradicting them produced and interrogated other witnesses. There was no objection that testimony offered by appellant to prove duress was not within the issues or that it was for that reason incompetent. No one was misled or injured by any informality or imperfection in the answer, and it will now be given the same interpretation as that adopted by the pleader, by her adversaries and by the trial court. For the purpose of preventing the review of a defense which was perfectly understood and fully tried, undue importance will not be attached to mere technical objections to an answer in equity. An objection to the authentication of the bill of exceptions is likewise without merit.

Did Byers Brothers & Company procure the signature and acknowledgment of appellant by duress? In considering this question, her physical and mental condition, the surrounding circumstances and the attitude of the parties in conducting the negotiations and in dealing with each other are proper subjects of inquiry. During her married life appellant was frail and excitable. She had 10 chil-

dren, the oldest being 23 and the youngest 3. Occasionally for many years prostration followed nervous attacks. Two physicians testified to the opinion that her nervous disorder was hysteria, that it was permanent, and that it seriously affected her conduct and impaired her will-power. She lived with her family on their 80-acre homestead about five miles from Greeley Center. Her husband, after having been a prosperous ranchman, engaged extensively in the live stock business. He made his sales at South Omaha stock-yards through Byers Brothers & Company, mort-. gagee. The latter advanced him money to make purchases. Late in the afternoon of May 24, 1907, B. F. Hertzler, a representative of mortgagee, and Mr. Shotwell, its attorney, appeared unannounced at the home of appellant in absence of her husband, and interviewed her in her own house in presence of her son Edward, who was about 21 years old. She was distinctly told that an indebtedness of her husband, which they were seeking to secure by mortgage on her real estate, was about $12,000, and that his commission merchant, Byers Brothers & Company, had a chattel mortgage on about 200 head of cattle. It is undisputed that this information surprised her. She did not owe any part of the indebtedness, nor know of its existence. She told them her husband did not have the live stock mentioned. Hertzler exclaimed: "That's strange." They repeatedly asked her to consent to the giving of a real estate mortgage to secure her husband's debt, but throughout the entire interview she steadfastly refused to do so, and they left her in the evening with the parting admonition to "think it over during the night," and to come to Greeley Center the next morning, stating that their train left for Omaha about 8:30 A. M. These facts and conclusions as to what occurred at their interview are proper deductions from their own testimony and cannot be successfully controverted. Thus far there is nothing to show a direct threat of imprisonment, but enough was said to create in the mind of appellant the fear that her husband might not escape punishment for felonious conduct in con-

nection with his chattel mortgages. This was not the first time the nature of the duties and obligations imposed by her husband's chattel mortgages had engaged her attention. The evidence relating to direct threats of imprisonment is conflicting. Edward, a son of appellant, said repeatedly on the witness stand that he plainly heard Hertzler say to his mother that, "if she didn't sign, he [husband] would have to go to jail, and they would eventually take the property anyhow." Appellant testified directly and positively that Hertzler made threats of like import. Shotwell said he heard no such threats. Hertzler denied having made them, but admitted on cross-examination: "I told her we didn't want to frighten her or scare her. I told her I was sorry I had to come in and bother her, and I thought she ought not to be frightened." Here is an inference from his own testimony that in presence of her son he had already done something to frighten her. If she felt free to resist their demand for a mortgage on the family homestead and on her separate estate to secure a debt she did not owe, why was she frightened?

Edward testified that, after they left, his mother walked the floor crying and saying she would have no home for her children, and that if she had to sign a mortgage her husband wouldn't have to go to jail; that his mother had not retired at 1 o'clock; that he saw her at 4; that she was nervous and agitated; that she left with him for Greeley Center at 7, and that they made the trip in the rain during a thunderstorm. The evidence shows that when she reached town she went to a store kept by a brother of her husband; that she was excited; that her eyes were inflamed from weeping; that she there met her husband and his attorney, J. R. Swain; that her husband pleaded with her to sign the mortgage, but that she refused; that no one advised her to protect the family homestead and her separate estate; that she told Swain she would not execute the security, but that, if she had to, she preferred to give a deed rather than a mortgage. After a short conference, she and her husband and Swain went to the latter's office,

where they met Hertzler and Shotwell. It was understood by all present that her business interests and her intentions were in direct conflict with the wishes of her husband. On the witness stand Swain said he thought appellant had asked him at the store if her husband's conduct had been criminal, and he admitted that he might have advised her, if the facts stated by her were correct, that her husband was in no position to stand a lawsuit. In any event, Swain gave her no encouragement in her oft repeated purpose not to sign a mortgage. He did, however, advise her, when she was suffering from the ordeals described, when she was confronted in his office by three men who were impatiently insisting on her signature, when she was struggling with a mother's impulse to protect the home of herself and her children, and when she was seized with a fear that to do so would result in the imprisonment of her husband, that it would be better to give a mortgage than a deed. This identical advice had been given by Hertzler the evening before. After Hertzler and Shotwell had started to the station, she hastily signed the mortgage. They returned, left it in the hands of Swain for acknowledgment, and rushed to the train. Appellant then went to the residence of a friend in town, said she had been compelled to mortgage her property, and that she would lose her home. She spent the greater part of the day there in hysterics and in bemoaning her fate. She testified, without objection, that she was induced by threats to sign the mortgage, and the evidence and circumstances, when considered as a whole, sustain her in that view. She successfully resisted the importunities of the creditor of her husband. She did not yield to his pleading, nor to the advice of his counsel, but she signed the mortgage when the agent who had threatened her husband with imprisonment started to the station in disappointment. She was not a free agent in the sense that she voluntarily executed the mortgage. She did not act on her own judgment. The advice of her husband and of his attorney, under the circumstances of this case, does not avoid

the consequences of duress. She was moved by fear which overpowered her will. The duress applies with equal force to appellant's offer to execute a deed. In equity, therefore, the family homestead of 80 acres and her separate estate of 160 acres are not incumbered by the mortgage which she was unduly induced to execute, and as to that property the foreclosure is erroneous. *Nebraska Central Building & Loan Ass'n v. McCandless*, 83 Neb. 536. Only a brief reference to the controlling facts and conditions has been made, but all of the evidence has been carefully read and weighed.

Was plaintiff's mortgage on the same land procured by duress? It was executed at an earlier date—November 15, 1906. If the procuring of this mortgage and the one already discussed had been planned by the same person, the methods adopted would scarcely have been more similar. Plaintiff's mortgage is a renewal of older obligations of Patrick H. McCarthy, appellant's husband. His mortgage indebtedness to plaintiff consisted of a number of items aggregating with interest $8,801.03, June 2, 1906. About that time the entire debt was due the First National Bank of Greeley, except $1,000 owing to one of its officers. The first of the original items was a loan of $3,000, April 15, 1905, and a later one was a note for $3,567 given by McCarthy, January 16, 1906, for the purchase price of cattle, and discounted by the bank. The latter note was secured by a chattel mortgage on cattle. Some time during the winter or spring of 1906, McCarthy disposed of the cattle without satisfying the lien of the chattel mortgage. The loans were excessive and could not properly be carried by the bank. Three of its officers undertook to relieve it of the load created by McCarthy's paper and to obtain security in the form of a mortgage on the 720 acres of land owned by McCarthy and wife. The bank officers were Theophilus Hoellworth, plaintiff, of Greeley Center, Cornelius Bradley, of Wolbach, A. P. Cully, of Loup City. There was no attempt to disguise their anxiety to relieve the bank and to procure real estate

security. Who should carry the loan? The business sagacity of these bank officers cannot be doubted. McCarthy was willing to give security in the form demanded. Appellant alone objected. The amount due the bank and its officer was included in a mortgage executed by McCarthy and wife to Bradley, June 2, 1906. For the same debt with accrued interest plaintiff, as Bradley's transferee, procured on November 15, 1906, another mortgage which is the subject of foreclosure herein. Should the separate estate of appellant and the family homestead be sold to satisfy plaintiff's mortgage? Her answer is that her signature and acknowledgment were in both instances procured by threats that her husband would be imprisoned if she failed to execute the mortgages. The question presented requires an examination of the circumstances relating to both transactions. Many of the facts are not in dispute, but the bank officers deny every imputation implying duress. No part of the indebtedness was appellant's, nor did she receive any of the consideration for her husband's notes. Her first business interview with the bank or with any of its officers, according to her own story, occurred late in May, 1906, when plaintiff came to her house one afternoon, in absence of her husband, and told her the latter had borrowed a large amount of money, and asked her to sign a mortgage on her real estate, and was told by her that she was not aware that her husband owed him or his bank anything. A few days earlier she had been in Montana at the death-bed of a brother, and her account of her trip indicates that she had recently been in hysterics from which she had not recovered. She said that she was ill and weak during her interview with plaintiff; that he told her he had given the money to her husband who furnished chattel security; that he did not find the security there; that her husband had left himself in a bad place; that something had to be done; that she was frightened; that she refused to sign the mortgage; that after her husband had been informed of the interview he went to Greeley Center, saw the bankers, and told her

to come to town; that she went to the bank, June 2, 1906, and first refused to sign the mortgage, but finally did so through fear inspired by plaintiff's threat that her husband would be punished criminally if she did not yield. McCarthy testified that plaintiff reminded him of the chattel mortgage, and told him he would be sent to the penitentiary if he did not give them a lien on the land; that he communicated this threat to his wife who went into hysterics. While plaintiff denies that he had made any threat, he admits that he had the interview in absence of appellant's husband; that he went to her house to procure a real estate mortgage; that he visited with her on the subject; that possibly he said to her, "This new loan was to take up the loan secured by the chattel mortgage;" that she told him her husband "would have to mend his ways." To arouse a sense of fear, it was not necessary to advise her that the mortgaged chattels were missing. She would know without being told that they were not in the feed-yards, though she had known nothing of her husband's banking transactions. A covert threat may fairly be inferred from plaintiff's own testimony, and it was as effective for the purpose of inspiring fear as a direct statement. Its very refinement may have made it appear more ominous to a hysterical woman. In any event, it is proper to hold from all the evidence that appellant, when the family homestead and her separate estate were at stake, was able to resist every inducement, but the fear produced by threats to imprison her husband. There was no attempt to foreclose the Bradley mortgage, but it was used five months later to obtain for the very person who had procured it by duress another mortgage on the same property to secure the same debt. Appellant persistently refused to execute the mortgage pleaded in plaintiff's petition, but finally yielded through the same fear that controlled her judgment when she signed and acknowledged the Bradley mortgage.

Plaintiff has a lien on McCarthy's land, but his mortgage should be canceled in so far as it purports to incum-

ber appellant's separate estate of 160 acres and the family homestead of 80 acres. The same relief is granted as to the mortgage of Byers Brothers & Company. In other respects the decree below is affirmed, the costs in this court to be taxed in equal proportion to plaintiff and Byers Brothers & Company.

AFFIRMED AS MODIFIED.

LETTON, J., not sitting.