JOSEPH A. GRASSO, APPELLEE, V. ADOLPH DEAN ET AL., APPELLANTS, IMPLEADED WITH STATE FINANCE COMPANY, A CORPORATION, ET AL., APPELLEES.

107 N. W. 2d 421

Filed February 3, 1961. No. 34848.

*Philip M. Kneifl* and *Abrahams, Kaslow & Cassman,* for appellants.

*Joseph T. Votava,* for appellee Grasso.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, WENKE, SPENCER, and BOSLAUGH, JJ.

SPENCER, J.

This is an action by appellee Grasso, hereinafter referred to as plaintiff, against appellants Adolph, Gladys, and Joan Dean, hereinafter referred to as defendants, and defendant corporations, State Finance Company, Postal Finance Company, and First Loan Company. It seeks to foreclose a mortgage on the home owned by defendants Adolph and Gladys Dean, in which the three

defendant corporations are alleged to claim some interest. The mortgage was given to secure an installment promissory note signed by the three defendants Dean.

The defense raised by defendants Adolph and Gladys Dean, hereinafter referred to as Adolph and Gladys, is that the promissory note and mortgage were without consideration and were obtained by the use of duress and threats. Defendant Joan Dean, hereinafter referred to as Joan, pleaded duress and the disaffirmance of the contract because of infancy.

The trial court in its judgment found that defendant corporations, State Finance Company and First Loan Company, had failed to plead or answer; and entered their default. It found defendant corporation, Postal Finance Company, to have a first lien on the property involved herein. It found plaintiff to have a second lien in the amount of $7,432.56 as of February 18, 1960. The trial court then entered a judgment of foreclosure and ordered that if the proceeds of the sale were insufficient plaintiff on motion would be entitled to a deficiency judgment against defendant Joan.

The essential facts are: Defendant Joan entered the employ of plaintiff, a dentist, in 1954 as an office clerk, receptionist, and technician. Plaintiff had been in practice but a few months. Joan was 16 years of age but represented herself to be 18. During the years 1956 and 1957, Joan embezzled funds belonging to plaintiff. According to plaintiff's testimony, Joan admitted "about the fourth or sixth month * * * of 1957," that she had been taking money, but could not give the amount. Audits were made by plaintiff's accountant. On October 24, 1957, Joan, in the office of plaintiff's accountant and in his presence, and in the presence of plaintiff, signed an "affidavit of admission," but no amount was stated. During December 1957, Joan made two payments on the obligation. Subsequent to these payments, plaintiff insisted that Joan bring her father to his office. About 2 weeks previous to February 18, 1958, Joan brought

Adolph to plaintiff's office. Previous to this time, Joan had not wanted her folks informed. At this visit, plaintiff discussed Joan's difficulty with her father, who, according to plaintiff's testimony, said, "he would help her in any way he could, and he was appreciating what I was doing." On February 18, 1958, Joan and Adolph met plaintiff at the home of plaintiff's accountant, and signed a note for $7,974, and Adolph executed a mortgage on the Dean home. The Deans had never furnished plaintiff with a description of the property nor had there ever been a specific reference to a mortgage on their home. The papers were prepared by plaintiff's attorney, who never appeared in the transaction. The note and mortgage were signed. Then Adolph, Joan, plaintiff, and the notary public went to the Dean home where the instruments were signed by Gladys who had not previously been informed about Joan's difficulty.

The evidence on the amount of the defalcation is in dispute. Joan contends it could not have exceeded $1,500. The testimony of plaintiff's witness sets the amount at $8,200.38. The note was for $7,974. Payments have been made in the amount of $1,283.45. All of these payments were made by Joan. The testimony of the parties as to the alleged facts constituting duress is in conflict, and no purpose will be served by detailing the respective contentions of the parties. Suffice it to say that the testimony, in the light of the circumstances apparent from the record, leaves little doubt as to the way the issue should be resolved.

The evidence in this case is undisputed that Joan did embezzle funds of plaintiff. However, in considering the defense of duress herein, the question of her guilt or innocence is immaterial. The question is whether the facts and circumstances, as disclosed by the record involved, constitute duress. In Nebraska the law is well established that where a parent or other relative is induced to execute an instrument by threats and fear of criminal punishment of a child or relative, the instru-

ment is the result of duress and the contract may be voided. Beindorff v. Kaufman, 41 Neb. 824, 60 N. W. 101; Hoellworth v. McCarthy, 93 Neb. 246, 140 N. W. 141, 43 L. R. A. N. S. 1005.

We said in Farmers State Bank v. Dowler, 112 Neb. 262, 199 N. W. 528: "Any wrongful influence designedly exerted by an interested party and producing a condition of mind that deprives the other party of the exercise of his free will may amount to duress and invalidate a contract signed while the influence prevails."

Plaintiff testifed: "* * * we have never told them that we were going to prosecute, all we told them was *that we weren't interested in having any trouble, we weren't interested in hurting them or harming them in any way,* but we just wanted to help them. * * * I had never mentioned any threat of any kind, but I had told him that *I knew that it was a bad situation and that I would like to help them as much as possible.* * * * Q. But let's try and get one point clear. Up to the time he walked into this room and saw a note and a mortgage that was on the table, you had never had any real discussion with him about the fact that you were asking him to be bound by a promissory note to pay you back in full on the amount you claimed and also to put up his house as security? A. As I recall, I had told him that I had discussed this with my attorney on a meeting previous to the time we met in Mr. Watts' office, that I had told him that we should do it in a legal manner and he knew that that was the reason he was to come there, to sign these legal notes and documents. * * * Q. All right, let's go back. The first meeting with Mr. Dean at your office did you tell him that you expected him to sign a promissory note in the sum of approximately $8,000 and to execute a mortgage on his home directly to you to pay for Joan's defalcations? MR. GARROTTO: I object to that as already answered. THE COURT: He has already answered that; he said no." (Italics supplied.)

The testimony of Wesley Fox, the notary public who took the acknowledgment and who was called by plaintiff, is as follows: "I believe that some mention was made concerning the papers, and now, whether the word 'mortgage' was mentioned, I do not recall, but as I recall the conversation, he indicated that if the Deans would sign this mortgage, that no charges would be pressed, and that the doctor did not want to press any charges, he merely wanted to work it out with them. But I don't believe Mr. Watts used the word 'prison' at all, I believe the actual words were something about preferring charges or something of that nature." It is true that the witness was referring to his conversation with plaintiff's accountant Watts and not to any conversation with plaintiff. It is inserted here because of the light it tends to shed on statements made by plaintiff's accountant who was an active participant in securing the instruments.

Plaintiff's accountant Watts testified: "Q. Now then, was anything else said there with reference to the amount due at that time? A. I said that it being a large amount, and there wasn't an exact amount specified other than it was large, that we'd all have to work it out together. Mr. Dean thanked us very much for cooperating the way that we had, and I said to Mr. Dean, 'There is no reason why this thing can't be worked out.' * * * Q. Now, Mr. Dean was already there when you arrived? A. That's correct. Q. Did you observe the way he appeared when you arrived? Was he broken up at that time? A. At first he was, yes. Q. He had been crying? A. Well, there was tears in his eyes. I would assume. Q. And then you joined in the conversation? A. Correct. Q. And do you remember what your words were as you began the conversation, or what you said? A. Well, to the effect that the money that Joan had taken, *we didn't want a lot of publicity about it, we wanted to try and help them work things out,* that all we were interested in is Doctor getting his money

back. Q. Did you say something about the fact that she was in a serious position? A. That's correct. * * * Q. Just tell us what you said, just what you said in regard to paper. A. *That we wanted to try to rehabilitate her, we didn't want to persecute her, we wanted to do everything to help her. In other words, just because she is down we didn't want to trample her, we wanted to help her.*" (Italics supplied.)

The word "persecute" as used by the witness would ordinarily have an entirely different meaning, but as used here could logically be calculated to induce fear of prosecution. Joan had confessed to taking money several months before. She had given a written admission on October 24, 1957. She had also made payments on the obligation. What was to be "worked out"? What was plaintiff doing that Joan's father appreciated? Why wasn't it necessary for plaintiff to discuss the amount with the father? Why was plaintiff so certain the Deans would give a mortgage on their home that he had one prepared without even discussing it with them before the night it was executed? When we consider the substance of the testimony adduced by plaintiff, we can readily conclude the obvious answer must be the correct one. There was a threat of prosecution under plaintiff's evidence, and while not stated in so many words, it evidently produced the desired condition of mind.

The testimony of defendants is to the effect that they signed because otherwise Joan "would just have to go over the road."

In this case, which we try de novo, we resolve the fact question in the affirmative and hold that a disguised threat may fairly be inferred from the testimony adduced on behalf of plaintiff, and that such threat was as effective for the purpose of inciting fear as a direct statement. Hoellworth v. McCarthy, *supra.* We believe the consideration for the giving of the note and mortgage was the suppression of a criminal prosecution, and find

the transaction illegal and void and that no recovery can be had thereon. Smith Premier Typewriter Co. v. Mayhew, 65 Neb. 65, 90 N. W. 939.

There is a wide variance between Joan and plaintiff as to the amount of the defalcation. While it is generally true that an embezzler little realizes how fast his abstractions move into large figures, it does test credulity to believe that a dentist in practice only 3 years and operating alone would not notice the withdrawal from January 1, 1956, to "the fourth or sixth month * * * of 1957," of over $8,000. This is an average in excess of $400 per month. The evidence is that plaintiff personally made all of the bank deposits. He could not help but have some awareness of his volume of business. A minor should be held liable for defalcations. If, however, there has been a misrepresentation of the amount involved, or if the minor has been overreached, certainly relief should be granted, and she should have her day in court.

We find the note and mortgage void, and as to defendants Adolph and Gladys Dean we reverse the judgment of the trial court and dismiss the action. As to defendant Joan Dean we reverse the judgment of the trial court and remand the cause for further proceedings, with costs in this action taxed to plaintiff.

REVERSED AND REMANDED WITH DIRECTIONS.