LEE P. HAUMONT ET AL., APPELLEES, V. SECURITY STATE BANK,
BROKEN BOW, NEBRASKA, APPELLANT.

374 N.W.2d 2

Filed September 20, 1985.   No. 83-955.

Gary L. Dolan of Knudsen, Berkheimer, Richardson & Endacott, for appellant.

M.J. Bruckner of Marti, Dalton, Bruckner, O'Gara & Keating, P.C., for appellees.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

HASTINGS, J.

This is an appeal by the defendant, Security State Bank, from a judgment of the district court granting equitable rescission of a guaranty agreement, note, and mortgage executed by the plaintiffs, Lee P. and Letha Haumont. The errors assigned are generally three in nature: (1) The evidence was insufficient to support rescission on the ground of business duress; (2) The evidence failed to establish that proper notice of rescission had been given; and (3) The court erred in not requiring proof that the defendant was returned to its status quo. We affirm.

The plaintiffs' action for rescission is equitable in nature and as such is reviewable by this court de novo on the record. However, when the evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying and adopted one version of the facts rather than the opposite. *Nixon v. Harkins, ante* p. 286, 369 N.W.2d 625 (1985). The application of this latter rule is crucial in our review of the evidence.

The plaintiffs are husband and wife living in Broken Bow and have been farming their own 1,500 acres of land in Custer County for over 40 years. Glen Haumont is their son, and he had operated M & G Implement, Inc., in Broken Bow since the summer of 1977.

M & G Implement ran into financial difficulties in the fall of 1981. As a result, the plaintiffs arranged a loan for the company in the approximate amount of $75,000 with the defendant bank. This was the first that either of the plaintiffs knew of their son's financial difficulties.

During the early part of January 1982, the defendant bank and the Broken Bow Production Credit Association (hereinafter PCA) became aware of installment sales contracts originated by Glen which were irregular. After meeting with Glen and investigating further, it was discovered that six

contracts, totaling some $324,000, were improperly handled by M & G. On two contracts Glen had resold machinery and failed to pay off the lienholder; on three contracts he had financed the same machinery more than once; and on one contract he had simply forged and subsequently financed. This was in addition to the $251,932.60 that was owed to the defendant on M & G's line of credit. During this time, Glen and his attorneys were trying to work with the bank to refinance his business.

On January 20, 1982, Glen was at his parents' home, and, after speaking with his attorney on the phone, he told his father that he, Glen, could be prosecuted and sent to jail. He went on to describe jail conditions, including his fear of drugs and prostitution. Glen did not say specifically why he could go to jail, only that he had financial troubles, and his father was unaware of his business dealings.

On February 8 Glen arranged for his parents to meet with him and his accountant to see if they would be willing to financially back his business. According to the plaintiffs and the accountant, the Haumonts refused to back the business. The next morning Glen spoke to David Schweitz, president of the defendant bank, who had been looking after the interests of the bank with regard to M & G. Glen indicated that his parents were willing to back the long-term financing of the business. According to Schweitz, Glen had claimed all along that his parents were definitely going to help him out.

As a result of that phone call, Schweitz, the bank's attorney, and the president of the PCA determined that they needed written confirmation of the plaintiffs' commitment to M & G and Glen. The bank's attorney contacted Glen's attorney, who drew up a document for Lee Haumont to sign, which reads as follows:

> I, Lee Haumont, intend to pursue a course of action which is reasonably calculated to result in the refinancing of M & G Implement, Inc. I intend to do this by pledging my real estate (in Custer County) as collateral for a sufficient loan to cover the debts of M & G Implement with an appropriate financial institution.

On February 12, 1982, Glen went to see his father and asked him to sign the statement. Lee insisted on seeing his lawyer,

Howard Spencer, who advised him not to sign. Eventually, however, Spencer added a paragraph which allowed his client to withdraw the letter of intent until February 26, 1982, and Lee signed it. Lee testified that he signed it because his son told him it would give Glen 10 more days to straighten up his business before the bank closed him up. Upon receipt, the bank refused the statement and demanded that the original document, without qualification, be signed.

On February 15 Glen went out to his parents' home and tried to convince his father to sign the original statement of intent. Lee refused to sign. Glen stayed approximately 3 to 4 hours, and as he pulled out to leave he met David Schweitz just arriving. The two returned to the plaintiffs' home and found Lee in his garage.

According to Lee, both his son and Schweitz told him that Glen had past due notes, and if he did not sign the statement of intent, Glen would be prosecuted and would go to jail. The three went into the kitchen, where Lee signed the paper. He stated that he signed it because he did not want to be responsible for sending his son to jail. Contrarily, Schweitz testified that no threats were made and that Glen asked his father to sign and he agreed. After the document was signed Letha Haumont entered the kitchen and berated Schweitz for loaning Glen so much money. Thereafter, Schweitz left.

The next morning Lee called Schweitz and told him not to come out and that he did not want to sign any more papers. Schweitz responded that he wanted to come out and explain the transaction, and Lee agreed. In between the phone call and the previous signing of the document, the bank's attorney had spoken to Glen's attorney and had found out that equipment from M & G had been shipped out of state. As a result, Schweitz had the bank's attorney draft a guaranty agreement and a mortgage, which the bank president wanted the plaintiffs to sign.

Schweitz and Glen went out to the plaintiffs' home at approximately 11:30 on that morning, February 16. According to the plaintiffs, Schweitz had Lee read the guaranty agreement and mortgage. Schweitz then threatened to prosecute Glen, through his Omaha attorneys, if the plaintiffs did not sign the

documents by 3 o'clock that afternoon. Lee signed both documents because it "[s]eemed like sending Glen to jail blanked out anything else and so I signed it." He was unaware that he had encumbered his previously debt-free land in the amount of $628,708.99.

Subsequently, Letha read both documents and did not understand them. She told Schweitz that she wanted her lawyer to look at them. In response he offered to, and in fact did, read the papers to her. She told him she still did not understand and wanted to wait for her lawyer. Schweitz said that he did not have time to wait for the lawyer to read it. He once again indicated that the guaranty agreement and mortgage had to be signed or Glen would be prosecuted. Letha also signed both documents and did so because "I was like his dad I couldn't lose another son and so I signed it."

According to both of the plaintiffs, Schweitz did not notarize the signatures at that time, and no description of the property that was subject to these agreements was included.

Letha Haumont testified that before her husband signed the guaranty agreement and mortgage, he was told by Schweitz, "Glen said he would like you to sign it, because if he didn't, he was going to start procedures against him and send him to jail and Mr. Schweitz said I got to have you sign before 3 o'clock."

Plaintiffs' daughter, Carol Lord, corroborated this testimony to the extent that she heard David Schweitz tell her mother before she signed the documents that "he needed to call his lawyer in Omaha by noon to let him know if they were going to prosecute Glen."

The plaintiffs' other son, Lee, Jr., was also present on the day the mortgage and guaranty agreement were signed. He testified that "Dave said that they was going to prosecute Glen and nobody would gain anything out of that, that we was further ahead to sign the mortgage and try and work it out."

David Schweitz himself testified that there was absolutely no discussion about pressing criminal charges against Glen. The attorney for the bank testified that he told both Glen and his attorney that criminal prosecution was not a part of its plans. He said that he specifically was aware of that factor, because not too long before this matter came up another bank in Custer

County had tried to force collection of a sum of money through threat of criminal prosecution.

There was a direct conflict between the parties as to the threat of criminal prosecution. The trial court accepted the version of the facts as related by the plaintiffs. This is substantiated by the fact that we find it wholly incredible that after 50 years of work and savings, parents of an adult son would risk their entire life savings to try to bail out that son's business which was in debt to the extent of $628,000 plus, absent the threat and concern that the son might go to prison.

"To constitute duress, there must be an application of such pressure or constraint as compels a man to go against his will, and takes away his free agency, destroying the power of refusing to comply with the unjust demands of another." *Buhrman v. International Harvester Co.*, 181 Neb. 633, 638, 150 N.W.2d 220, 223 (1967).

And in *Grasso v. Dean*, 171 Neb. 648, 650-51, 107 N.W.2d 421, 423 (1961), this court said: "In Nebraska the law is well established that where a parent or other relative is induced to execute an instrument by threats and fear of criminal punishment of a child or relative, the instrument is the result of duress and the contract may be voided."

The record in the instant case makes clear that Lee Haumont met with counsel on February 12, 1982, and he was advised not to sign an unconditional promise to finance his son's business. Lee followed this advice and subsequently agreed to a revocable promise drafted by his attorney, because "[t]hat was to give Glen 10 more days . . . to straighten his business up . . . ."

It was not until 3 days later, and after Lee had refused once again to sign an unconditional promise, that the bank president came into the picture. Both Glen and Schweitz pressured Lee into signing a financial commitment by stating that Glen's notes were past due and that if the plaintiff did not sign, his son would be prosecuted. The following day a similar pattern was followed concerning the mortgage and guaranty agreement.

Further, the testimony of witnesses indicates that Letha Haumont in fact requested her attorney's assistance, that Schweitz indicated that it was unnecessary, and that he put pressure on her to sign by threatening prosecution.

As Lee Haumont said, "Seemed like sending Glen to jail blanked out anything else and so I signed it."

The defendant contends that the Haumonts did not properly plead and prove notice of rescission as required by *Anson v. Grace*, 174 Neb. 258, 117 N.W.2d 529 (1962). However, that case involved a "legal rescission" where the party has attempted to rescind a contract by his own act. The rule applicable in this case is that expressed in *Geise v. Yarter*, 112 Neb. 44, 53-54, 198 N.W. 359, 363 (1924):

> It is objected that no notice of rescission was given before suit, but this was not necessary. When a party seeks to rescind a contract by his own act, he must give the other party notice; but when he seeks the aid of a court for that purpose, the bringing of the action is sufficient disaffirmance for the purpose of the action.

Although notice was in fact given to defendant's attorney on February 23, 1982, and to the defendant on March 5, 1982, under the rule of *Geise* no notice was required.

The defendant insists that it is entitled to restitution, i.e., to have the plaintiffs repay the money defendant paid out following the execution of the various documents. However, defendant again confuses legal rescission with equitable rescission, which distinction was drawn in *Geise* and expanded on in 12A C.J.S. *Cancellation of Inst.* § 4 at 646-47 (1980):

> Strictly speaking, in a law case, the rescission is by act of the party and is a condition precedent to bringing an action to recover money or thing owing to him by any other party to the contract as a consequence of the rescission, and by his rescission or repudiation of a contract a party merely gives notice to the other party that he does not propose to be bound by the contract. A court of law entertains an action for the recovery of the possession of chattels, or, under some circumstances, for the recovery of land, or for the recovery of damages, and although nothing is said concerning it either in the pleading or in the judgment, a contract or conveyance, as the case may be, is virtually rescinded; the recovery is based on the fact of such rescission and could not have been granted unless the rescission had taken place.

In equity, on the other hand, the rescission is effected by the decree of the equity court which entertains the action for the express purpose of rescinding the contract and rendering a decree granting such relief. In other words, a court of equity grants rescission or cancellation, and its decree wipes out the instrument, and renders it as though it does not exist.

In recognizing this distinction, D. Dobbs, Handbook on the Law of Remedies § 4.8 at 294 (1973), states that "[s]ince rescission is not accomplished 'in equity' until the court so decrees, the plaintiff has no obligation before suit to make restitution of goods or money he received from the defendant."

Finally, it is stated in 12A C.J.S., *supra* at § 57 at 732, "An offer of restitution is not necessary where receipt of any benefit is denied by plaintiff and the good faith of defendant is challenged."

Although in this case the bank suffered a detriment when it paid out some $89,000, which generally furnishes a consideration for a contract, no benefit was conferred on the plaintiffs, and we have found that the bank acted in bad faith. The effect of our decision here is to declare the guaranty agreement, note, and mortgage void, and any obligation the plaintiffs would otherwise have had to repay those funds expended by the bank expired with the voided instruments.

The judgment of the district court is affirmed.

AFFIRMED.