Collison v. Ream.

---

JOHN S. COLLISON ET AL., APPELLEES, V. JOHN L. REAM, APPELLANT.

FILED JANUARY 7, 1914.   No. 17,412.

1. **Contracts: RESCISSION.** One who seeks to rescind a contract must rescind the whole contract. He cannot accept and retain the benefits of that portion of it which is beneficial to him and at the same time rescind and set aside that portion which is not to his advantage.

2. ———: ———. Where C. & C., the owners of a mill, who were desirous of procuring the services of W. as miller, agreed with W. & R., who were the owners of stock in a corporation which owned a patent for a washing machine, and a small amount of other property, that they would incorporate the milling business, and issue to W. & R. 66 shares of stock, being one share more than one-half of the stock issued, in consideration for the transfer to them of 75 shares of stock in the other corporation; and after the exchange was effected W. took charge of the mill and the business, improved the property, and increased the sales, and W. & R., either directly or indirectly, furnished $1,500 for the use of the milling company in the business, a petition by C. & C. tendering 38 shares of stock in the other corporation to R., and seeking to rescind the transaction as to him on account of false statements as to its value and extent made by him in procuring the contract, while affirming it as to W., *held* to show no equity

in the bill; *held*, further, that, if C. & C. are entitled to rescind the contract, it must be as a whole, since they are not entitled to accept and retain that portion of the contract which is advantageous to them and rescind that portion which is to their disadvantage.

APPEAL from the district court for Valley county: JAMES N. PAUL, JUDGE. *Reversed.*

*T. J. Doyle, G. L. DeLacy* and *J. R. Swain,* for appellant.

*E. P. Clements* and *J. R. Berry, contra.*

LETTON, J.

This is an action to rescind an executed contract for the exchange of stock in two corporations. Plaintiffs succeeded in the action, and defendant appeals.

Many of the facts are not disputed and these will be summarily stated. About September 1, 1908, the plaintiffs John S. and August K. Collison were the owners of a flouring-mill operated by water-power situated at Ord, Nebraska. One William A. Wright, a practical miller and mechanic, was the inventor and patentee of a washing machine, which at the time was being manufactured by the Nebraska Incubator Company, of Fairfield, Nebraska. John L. Ream, the defendant, and Wright had been associated together for some time as partners, under the name of the Wright Washing Machine Company, in procuring the manufacture and sale of the washing machine, and had a written contract with the incubator company for the manufacture of its machines in quantities. The Wright Manufacturing Company, a corporation, was afterwards organized for the purpose of taking over this business; Ream and Wright owning all the stock at the time of the exchange. In August, 1908, Ream met John S. Collison at Ord, and some conversation was had between them, in the course of which Ream stated that he and Wright were in the washing machine business; that Wright was an experienced miller; that they wanted to get an interest in

the Ord mill so that the establishment of the Wright Manufacturing Company could be placed at Ord and be operated with the same water-power. The Collisons were not practical millers, and wanted to avail themselves of Wright's experience and ability as a miller and machinist. Shortly afterwards Wright and Ream went to Ord, and the parties made a tentative agreement. Under the arrangement then made, Collison Brothers were to form a corporation which should take over the mill property and business, under the name of the Ord Milling Company, with a capital stock of $25,000, $13,000 of which was to be issued. Wright and Ream were to receive one share over one-half of the stock issued in exchange for 75 shares of stock of the Wright Manufacturing Company. After making some inquiries as to the assets of the Wright Manufacturing Company, they then went to Mr. Clements, an attorney, to have the contract drawn up, who advised Collison to go to the plant at Fairfield, where the washing machines were under construction, and look over the property of the company. Collison and Ream then went to the incubator factory at Fairfield, and from there to Axtel, Kansas, where the home office of the Wright Manufacturing Company was situated. Collison then returned to Ord, without Ream, and Wright and the plaintiffs closed the transaction in the office of Mr. Clements. Thirty-three shares of the mill company stock were transferred to Ream and 33 to Wright in exchange for the Wright Manufacturing Company stock. Immediately thereafter Wright removed to Ord, took charge of the mill, rearranged the machinery, and made other lasting improvements. The result has been that the grade of flour manufactured has been improved and the business of the mill has materially increased since Wright became miller. Ream, who is a traveling salesman, also helped to bring in new customers and increase the sales of flour. So far the facts seem to be undisputed.

Plaintiffs' petition bases their right to rescission upon the allegations that, at the time of the conversation in Ord, Ream represented that the Wright Manufacturing

Company was actively engaged in the manufacture and sale of washing machines, and was earning 30 per cent. upon the capital stock; that that company was the owner of washing machines complete and in process of construction, material, bills receivable, furniture, and other property, all of the value of $15,000, and was not in debt, and on the further allegations that afterwards, when Collison visited the plant of the Nebraska Incubator Company at Fairfield, he pointed out a large number of washing machines complete and partially complete, and a large amount of material for their construction, and there represented that all of this property belonged to the Wright Manufacturing Company; that afterwards plaintiffs discovered that the patent was of no value, that the corporation was not actively engaged in the manufacture and sale of washing machines, had never earned any dividends, was heavily in debt, that the washing machines and the property pointed out to him at Fairfield were not the property of the Wright Manufacturing Company but belonged to the incubator company and that the stock of the Wright Manufacturing Company was of no value whatever.

The answer pleads that the mill property, at the time of the transaction, was of little or no value, and was not being operated as a mill; that the Ord Milling Company was incorporated for the purpose of rehabilitating the mill and building up and developing its business; that no misrepresentations were made; that the Collisons had investigated the assets of the Wright Manufacturing Company, and there had been exhibited to them the contract with the Nebraska Incubator Company, and they knew the exact condition of affairs; that they also received from Wright a truthful and correct statement of the assets of the Wright Manufacturing Company. It is also alleged that, after the exchange, both Wright and defendant devoted their time, energy and skill to building up the mill; that plaintiffs refused to furnish any capital for that purpose, but defendant has supplied $2,000 in cash to buy grain and pay operating expenses; that, as a result of the efforts of himself and Wright, a

lucrative business has been established; that he has received no remuneration for his time and services; that, after the plaintiffs had full knowledge of the exact condition of affairs of the Wright Manufacturing Company and the value of its stock, it induced defendant to spend his money, time and efforts in the interest of the Ord Milling Company, and are estopped by their laches and delay from maintaining this action; and that there is no equity in plaintiffs' bill, for the reason that it does not offer to do equity by reimbursing the defendant for his money and services.

The action is brought against Ream alone to procure the surrender of 33 shares of stock assigned to him. John S. Collison seems to have conducted the exchange on behalf of himself and his brother. He testifies that in the conversation he had with Ream in Ord he was told by him that the Wright Manufacturing Company had assets of the value of $15,000; that it was making 30 per cent. on the investment; that the assets were washing machines, material for their manufacture, bills receivable, and money in bank; that, when they went to Fairfield, Ream showed him at the plant of the Nebraska Incubator Company a number of washing machines and a large quantity of material, and stated that it all belonged to the Wright Manufacturing Company and was paid for; that, at the office of the company in Axtel, Ream stated that the whole of their property was worth about $12,500 and he would have to give more stock to make up the deficiency. He also testifies that in June, 1909, he became mistrustful when no meeting of the Wright Manufacturing Company was held, but Ream told him they were doing nothing with the washing machine business until the mill business was in proper condition; that, when no meeting was held in 1910, he again looked into the matter, and that in July of that year he found out that the Wright Manufacturing Company did not own the property shown him at Fairfield, and owed $2,000. On cross-examination he testified that 75 shares of Wright Manufacturing Company stock was transferred to Collison Brothers, and that

he did not offer to rescind or turn back the stock before beginning suit; that Ream, or the Wright Manufacturing Company, had furnished $1,500 to be used in the mill business, which stood on the books to the credit of the Wright Manufacturing Company and that no offer had been made to return this money; that Wright told him that they did not own the factory, but that they had paid in advance for about 1,000 machines; that the mill is worth now from $9,000 to $10,000; that he would not have traded but for Mr. Wright coming into the mill.

August K. Collison testifies that, while his brother was getting ready to go to Fairfield, the witness had a conversation with Ream, in which Ream told him they had about 400 machines under construction, and material for about 1,000 more, and about $2,000 working capital, and that the business was paying about 10 per cent. on an investment of $15,000. He also testified that the value of the mill company stock transferred to Ream was about $3,300.

Mr. Clements testified that in the conversation in his office he asked Ream what were the assets of the Wright Manufacturing Company, and that Ream told him that they had a patent that was worth $50,000; that he then asked what were the tangible assets, and Ream said they had a great many washing machines and material, money in the bank, accounts, office furniture, and fixtures, in all worth $15,000; and that they had no debts.

It seems that, before making the exchange, John S. Collison went to Greeley Center to visit Mr. Wright. Mr. Wright testifies that in a conversation there he told Collison that Wright and Ream had paid $1,000 to the incubator company for manufacturing machines, which was true, and he denies specifically telling him that they had 1,000 machines which had been paid for in advance. He also says he then told Collison: "We possessed contracts with the Fairfield company, and possessed a patent on a washing machine, but we possessed no incubators or no factory;" that he was present at the conversation in Clements' office; does not remember hearing Ream tell Clements

that the property of the company was worth $15,000, that, if the statement had been made, he would have known it was false and would have told Collison so. Wright also testified to the improvements made at the mill, such as putting a new dynamo and smokestack; that the value of the mill at the time he took charge was $7,500, encumbered by a mortgage of $3,500, which is still unpaid, and there were $4,000 of debts, of which $1,000 has been paid from the business; that Collison had put no money into the business since he took charge; and that the property is now worth between $9,000 and $10,000.

Ream testifies that the Wright Manufacturing Company was organized in January, 1908; that previous to this Wright and Ream had sold 700 machines direct to customers; that afterwards they found it more profitable to have the sales made by the incubator company. He denies making any untrue statements while at Fairfield, or that they saw any material there, except some castings; testifies that at Axtel he showed Collison the contracts with the incubator company, the books, and everything pertaining to the business; and that Collison then said he understood that the contract, and the machines on hand were all the Wright Manufacturing Company then owned. He denies saying that the company had $15,000 worth of property, but says he stated at Clements' office that Wright and he had done about $15,000 worth of business. He testifies that the $1,500 was furnished by Wright and Ream to the milling company, and not by the Wright Manufacturing Company. He testifies further as to his efforts in procuring credit for the mill company, and to trying to procure customers for the flour.

Mr. VanSkyke, who introduced the parties and who was present at the conversation in Clements' office, says he understood the statement made by Ream to be, not that the assets of the Wright Manufacturing Company were $15,000, but that the company had done $15,000 business; that after the deal was closed August K. Collison said to him that, even if the washing machine business amounted to

nothing, he considered that if they got Mr. Wright into the mill it would be a good deal for them.

It is impossible to set forth the evidence in full, but the most material points are as stated. No effort has been made to rescind the contract so far as Mr. Wright is concerned; Collison giving as a reason that Wright had not misrepresented anything to them.

The impression we derive from the whole evidence is that Collison was so anxious to make the exchange that he almost deceived himself, but that at the same time that Ream's flamboyant statements as to the value of the assets were not justified, and the manner in which Collison testifies he was deceived at Fairfield was perhaps sufficient to justify a rescission of the whole contract if promptly made after the discovery. It seems a fair conclusion to draw from the evidence that, at the time of the exchange, the stock of the Wright Manufacturing Company was of very little value. The tangible assets consisted of 27 washing machines in a warehouse at Fairfield, a contract with the incubator company providing how much should be paid for the manufacture of each machine, allowing sales to be made by that company, and providing that for all machines sold by it a royalty should be paid to the Wright Manufacturing Company. This contract was of little or no value as an asset. There is nothing to show that this patent is of any merchantable value. From the fact that apparently neither salaries nor dividend had ever been paid, while it had borrowed $2,000, which was still unpaid at the time of the exchange, it would seem to be a fair conclusion that the net assets of the company were negligible. On the other hand, the evidence as to the value of the mill property and business at the time of the exchange is not very clear. Collison says it was worth $7,500 and was encumbered by a mortgage for $3,500. Wright agrees with this valuation, but says that the business owed also $4,034, of which $1,000 has since been paid out of the profits. If the latter statement is correct, the debts covered the assets, and the stock was worth no more than that of the Wright Manufacturing Company. The

witnesses agree the property is now worth between $9,000 and $10,000, but from this must be deducted the mortgage debt and the unpaid accounts. It would seem that Mr. Collison was exceedingly anxious to get Mr. Wright into the mill, and was of a very confiding nature, since he was willing to make the trade without making any examination of the assets until advised by his attorney to do so.

The appellant argues three points: First, that there is no evidence of any misrepresentations; second, the contract of exchange was between Collison Brothers and Wright and Ream, and could not be accepted in part and rescinded in part; that no sufficient tender had been made before suit, and that the plaintiffs are guilty of laches, and are estopped from rescinding the contract.

It is obvious that Wright and Ream each owned an equal number of shares of stock in the Wright Manufacturing Company and were jointly concerned in the exchange of the property. The agreement was by Wright and Ream to trade 75 shares of washing machine stock for 66 shares of mill stock. It is also shown that the moving cause for the exchange on the part of the Collisons was largely the desire to obtain Wright's services in the mill. In all the conversations Ream was talking for Wright and Ream jointly, and in the conversation that Collison had with Wright at Greeley Center, it was not a separate transaction that was discussed, but it was the exchange of stock of Wright and Ream in the one company for that of Collison Brothers in the other. The testimony also seems to show that the $1,500 which was furnished to the milling company after the exchange was procured by Ream and Wright on their individual credit. It was either furnished by them to the Wright Manufacturing Company and by that company transferred to and used by the milling company or it was furnished directly. The books are not in evidence, and the testimony is not quite clear. In this matter, as in all others connected with the mill transaction, Wright and Ream were acting together. As affairs now stand, the Collison Brothers have procured the services of Mr. Wright in the mill, and his technical knowl-

edge and skill have resulted in the improvement of the mill property and the building up of the business. Through Wright and Ream the mill has secured the use of $1,500 of money for which these men are individually liable to the lender. It is an elementary maxim that one who seeks equity must do equity. He cannot accept that portion of a contract which is beneficial to him and at the same time reject and seek to be relieved from that portion which he believes to be injurious to his interests. When a contract is rescinded, parties should be placed in *statu quo* as nearly as possible. The plaintiffs by the exchange of stock procured the opportunity to avail themselves of the services of Mr. Wright as a shareholder and employee in the mill, the use of $1,500 working capital, the increased value of the business caused by the technical knowledge and skill of Mr. Wright, and the conversion of a profitless undertaking into a successful business. They remain as stockholders in the Wright Manufacturing Company to the extent of one-half the shares of stock transferred to them. They still retain their share of the benefit to that company, or to the milling company, derived from the use of the $1,500 made available by Wright and Ream. They have enjoyed the benefits of the contract for about two years, and now only offer to return to one of the parties one-half of the stock transferred. We think it would be decidedly inequitable to allow the Collisons the use of the $1,500 while setting aside the transaction which was the moving cause of the loan.

Upon the whole case, we are of opinion that a sufficient tender to return has not been made; that the transaction was a joint one between Collison Brothers and Wright and Ream; that, if rescinded at all, it must be rescinded as a whole; and that as the case now stands there is no equity in the plaintiffs' petition.

The judgment of the district court is therefore

REVERSED.

BARNES, ROSE and SEDGWICK, JJ., not sitting.