RICHARD C. VAN PELT AND MARGARET JEAN VAN PELT,
HUSBAND AND WIFE, APPELLEES, V. NILE GREATHOUSE AND ROMA
GENE GREATHOUSE, HUSBAND AND WIFE, ET AL., APPELLANTS,
BANNER COUNTY FARMS, INC., A DISSOLVED CORPORATION,
APPELLEE.

364 N.W.2d 14

Filed March 8, 1985.   No. 84-089.

Brian Cook of O'Brien, Huenergardt & Cook, for appellants.

Robert W. Mullin of Van Steenberg, Brower, Chaloupka, Mullin & Holyoke, for appellees.

BOSLAUGH, HASTINGS, CAPORALE, and SHANAHAN, JJ., and COLWELL, D.J., Retired.

CAPORALE, J.

In this action the trial court reformed certain deeds executed by Grand View Ranch, Inc., a dissolved corporation, in which the plaintiffs-appellees, Richard C. and Margaret Jean Van Pelt, husband and wife, and defendants-appellants Nile and Roma Gene Greathouse, husband and wife, were equal shareholders. As a consequence of the decree of reformation, the Van Pelts became equal owners with the Greathouses of certain fractional oil, gas, and mineral interests formerly owned by the Greathouses. The Greathouses assign as error, among others, that the trial court failed to find the action derived from the Van Pelts' ownership of stock in a dissolved corporation and, as such, did not survive beyond 2 years after the dissolution of Grand View. We reverse and remand for dismissal.

The uncontroverted evidence establishes that the Van Pelts and the Greathouses formed Grand View, in which each of the two couples became equal shareholders and in which each of the four became an officer. The corporation then, on January 11, 1964, purchased approximately 7,560 acres of ranchland in Banner County from the Scrivens, who reserved an undivided one-half interest in the remaining minerals. Grand View then entered into the business of buying, feeding, and selling cattle. In 1970 the Greathouses purchased in their own name certain adjoining land from the Cross estate, which was later, on June 16, 1972, conveyed to Grand View. This conveyance reserved to the Greathouses all oil, gas, and mineral rights. In the early part of May 1972, Grand View, as lessor, entered into an oil, gas, and mineral lease with one Ronald Turtle on both the former Scriven and Cross lands, notwithstanding the fact that Grand View did not then own the former Cross land. Later, Turtle transferred his lease interest to Transcontinent Oil Company. On June 17, 1972, 1 day after their conveyance to Grand View, the Greathouses, unknown to the Van Pelts, entered into an oil and gas lease covering the former Cross land with Transcontinent Oil Company.

In the meantime, beginning in January of 1972, Grand View had begun to consider the sale of its land. Grand View listed its land and the former Cross land, then still titled in the

Greathouses, with various real estate brokers. In the summer of 1973, having been unable to sell its land holdings, Grand View began to consider selling only a portion of the land and dividing the rest among its shareholders, with most of the former Cross land to be conveyed to the Van Pelts. The corporate minutes concerning that discussion reflect that the Van Pelts and the Greathouses were to share equally "in all oil and mineral royalties." On December 20, 1973, Grand View sold and conveyed 3,840 acres of the former Scriven land to one Buford Carter, reserving to Grand View an undivided one-fourth interest "in and to all oil, gas, and other minerals, which GRANTOR now owns . . . ."

Following the Carter sale, Grand View disposed of its tangible personal property and conducted no business other than to pay salaries to its shareholder officers so as to deplete its assets prior to dissolution. Each couple operated the land it was to receive separately, sharing neither income nor expenses with the other couple. Corporate warranty deeds were executed by Grand View on February 5, 1976, carrying out the division of the land proposed in 1973, except that the deeds did not reserve oil, gas, or mineral rights in anyone and covenanted that the land was free from encumbrance, except easements, reservations, restrictions, rights-of-way of record, and oil and gas leases of record. The corporation was dissolved 20 days later, on February 25, 1976.

In late 1978 a son of the Greathouses, who handled the family's mineral interests, noticed that delay payments were still being made to the dissolved Grand View. It appears that up to that time the parties had not questioned the payments and simply divided them equally. Notwithstanding the fact that the Greathouses had reserved the oil, gas, and mineral rights in the former Cross land, the payments to Grand View had included payments on the former Cross land. As a result of the son's intervention, the Van Pelts and the Greathouses, on April 19, 1979, entered into a "correction agreement," which resulted in the payments being made in accordance with the title ownership of record; that is, the former Cross land was dropped from the Transcontinent Oil Company leases, each couple received an undivided one-eighth interest in the mineral interests under the

land sold to Carter, the Van Pelts were shown to own all the oil, gas, and mineral interests in the land deeded to them by Grand View, except for the part which the Greathouses had previously purchased from the Cross estate, and the Greathouses were shown to own all the oil, gas, and mineral interests in the land deeded to them by Grand View. At the same time, the parties executed other agreements with respect to the former Cross land, which, notwithstanding the titles of record and the aforedescribed "correction agreement," state that the Van Pelts own all the oil, gas, and mineral rights under the former Cross land now owned by them and that the Greathouses own all the oil, gas, and mineral rights on the small portion of the former Cross land now owned by them.

On October 25, 1979, the Greathouses sold and conveyed by warranty deed the land they had acquired from Grand View to Banner County Farms, Inc., a bona fide purchaser for value. Banner County Farms, Inc., has since been dissolved but is a defendant-appellee in this action. In their conveyance to Banner County Farms, Inc., the Greathouses reserved an undivided one-half interest in all oil, gas, and mineral rights.

In early 1982 a well drilled on the land then owned by Banner County Farms, Inc., and formerly owned by Grand View, began to produce oil. On May 19, 1982, the Van Pelts instituted this action to reform the February 5, 1976, Grand View deeds so as to reflect that the Van Pelts and the Greathouses acquired all the oil, gas, and mineral rights previously owned by Grand View, in equal shares.

With respect to the following matters, the evidence is in conflict. At trial Richard Van Pelt testified he knew when he left the offices of the corporation's attorney after the Grand View deeds were signed on February 5, 1976, that the Greathouses owned Grand View's former interest in the oil under the land they received, "plus whatever interest they had received under the Cross land." He also believed, however, from his understanding of the discussion with the Greathouses in the attorney's office, that at a later time there would be some "cross-deeding" so that the Van Pelts and the Greathouses would each end up owning an undivided one-half interest in all the oil, gas, and mineral interests under all the land conveyed to

each couple by Grand View.

No one else confirms Van Pelt's recitation of the discussion in the attorney's office. In fact, Margaret Van Pelt testified she was unaware that the mineral rights had not been divided as contemplated in 1973. Nile Greathouse testified that at the time the Grand View deeds were executed, the parties changed their 1973 position and agreed that each couple would receive the mineral rights with the land conveyed to that couple. The attorney has no recollection of what the parties discussed concerning mineral rights.

Even though Van Pelt, as he testified, thought Grand View's attorney would take care of the cross-deeding later, he talked with the attorney concerning the matter but once prior to 1980. This discussion resulted from a chance encounter at a grocery store and took place after an oil well was drilled in the area around the former Grand View land. On this occasion Van Pelt inquired as to whether the cross-deeding had been done; he was told that it had not. The Greathouses' son testified that when he discovered the erroneous delay payments previously referred to, he discussed the matter with Richard Van Pelt, who did not mention at that time that he thought he (Van Pelt) owned half of the mineral rights. Van Pelt, on the other hand, testified that it was Nile Greathouse who discussed the payment problem and that Van Pelt did tell Nile Greathouse that he (Van Pelt) did not care what was done so long as things were split 50-50.

Van Pelt testified that at one point Greathouse agreed to the cross-deeding, but the Greathouses' son objected. Nile Greathouse testified he only agreed to talk to the former corporate attorney about the matter but never agreed to cross-deed anything. Van Pelt also testified that after the correction agreement of 1979, he, "probably in 1980," placed a telephone call to the former attorney for Grand View and inquired as to whether the mineral interests were all straightened out. The attorney, apparently thinking Van Pelt was referring to the correction agreement, replied that everything had been taken care of.

The assignment of error set forth in the first paragraph of this opinion rests upon Neb. Rev. Stat. § 21-20,104 (Reissue 1983), which in pertinent part provides:

The dissolution of a corporation . . . shall not take away or impair any remedy available to or against such corporation, its directors, officers, or shareholders, for any right or claim existing, or any liability incurred, prior to such dissolution if action or other proceeding thereon is commenced within two years after the date of such dissolution.

Our recent decision in *Russell v. First York Sav. Co.*, 218 Neb. 112, 352 N.W.2d 871 (1984), applying that statute, controls the disposition of this case. In *Russell* the plaintiff minority shareholder sued the dissolved corporation and others, including the corporation's shareholder president, over 2 years after the corporate dissolution, claiming that the assets had not been distributed fairly because there had been an appropriation of a corporate opportunity by the majority shareholder. In affirming the sustainment of demurrers and dismissal of the action, we said:

Absent her status as a shareholder of York Investment, Russell would have no cause of action against any of the defendants regarding the dissolved corporation. In addition, there is no dispute that Russell's cause of action arose before dissolution of York Investment, since the suit was directed to the distribution of the assets of the corporation upon dissolution and the cash payment to be made in lieu of a distributive share of the assets of the corporation.

*Id.* at 116, 352 N.W.2d at 874.

Even though we agreed that the shareholder was asserting her personal rights, we stated:

Nevertheless, we find that any right asserted by Russell in the present case is dependent solely upon and arises from Russell's status as a shareholder of York Investment. Asserting her right as a shareholder or her individual nonshareholder right is the same, when each such right is entirely dependent upon and existing solely as an outgrowth of Russell's status as a shareholder.

*Id.* at 117, 352 N.W.2d at 874.

The suit here, just as the suit in *Russell*, involves a shareholder dispute as to the distribution of corporate assets.

However, the fact that this is an action in equity, *Johnson v. Stover*, 218 Neb. 250, 354 N.W.2d 142 (1984), requires that we make a further analysis of the nature of the provisions contained in § 21-20,104. This is so, for if § 21-20,104 were a statute of limitations, it would not necessarily control the time within which an action in equity must be brought. Although some jurisdictions hold that statutes of limitations apply alike to legal and to equitable actions, *Simmons v. Friday*, 359 Mo. 812, 224 S.W.2d 90 (1949), and *Anderson v. Anderson*, 234 Iowa 277, 12 N.W.2d 571 (1944), in the latter actions Nebraska relies on the concept of laches. In *Campbell v. Kirby*, 195 Neb. 610, 614, 239 N.W.2d 792, 795-96 (1976), we said:

> Although ordinarily one has an undoubted right to bring an action within the statutory period, courts of equity have inherent power to refuse relief after undue and inexcusable delay independent of the statute when not to do so would work injustice in the particular case. [Citation omitted.] What constitutes laches is to be determined in the light of the circumstances of the particular case. [Citation omitted.]

*Campbell* also observed, as had earlier cases, that laches does not result from the mere passage of time, but from the fact that during the lapse of time, circumstances changed such that to enforce the claim would work inequitably to the disadvantage or prejudice of another. In accord, among other recent cases, is *Roadrunner Development v. Sims*, 213 Neb. 649, 330 N.W.2d 915 (1983).

If § 21-20,104 is a survival statute rather than one of limitations, not even equity could estop its application. For, while a statute of limitations is a period of repose designed, if asserted, to prevent recovery on stale claims, a survival statute gives life to a substantive right that but for the statute would have been destroyed. *S.I.D. No. 32 v. Continental Western Corp.*, 215 Neb. 843, 343 N.W.2d 314 (1983); *Colton v. Dewey*, 212 Neb. 126, 321 N.W.2d 913 (1982); *Vielehr v. Malone*, 158 Neb. 436, 63 N.W.2d 497 (1954); *Canadian Ace Brewing v. Joseph Schlitz Brewing Co.*, 629 F.2d 1183 (7th Cir. 1980).

*Poliquin v. Sapp*, 72 Ill. App. 3d 477, 390 N.E.2d 974 (1979), interpreting a statute identical to Nebraska's, and applying

language in an earlier Illinois Supreme Court opinion, *The People v. Parker*, 30 Ill. 2d 486, 197 N.E.2d 30 (1964), held that the statute was one of survival and, therefore, the shareholders could not bring their derivative action more than 2 years after the date of dissolution. In accord is *Koepke v. First Nat. Bank of De Kalb*, 5 Ill. App. 3d 799, 284 N.E.2d 671 (1972), which held that the statute barred a suit in equity brought against the corporation by one shareholder on behalf of all shareholders.

Also interpreting the Illinois statute and reaching the same conclusion is *Canadian Ace Brewing v. Joseph Schlitz Brewing Co., supra*, holding that the statute applies not only to the dissolved corporation but to its shareholders and directors and that equitable estoppel could not apply to extend the 2-year time period, since the statute destroys the capacity to sue. Other cases in accord are *McGlynn v. Rosen*, 387 So. 2d 468 (Fla. App. 1980), and *MBC, Inc. v. Engel*, 119 N.H. 8, 397 A.2d 636 (1979).

We recognize that in *Russell v. First York Sav. Co.*, 218 Neb. 112, 352 N.W.2d 871 (1984), we refer to § 21-20,104 as a statute of limitations. It must be borne in mind, however, that *Russell* was a law action in which the nature of the statute was unimportant, concerning which no issue was present, and, therefore, no analysis as to its nature was either necessary or made. Denominating the statute as one of limitations was adequate for a proper resolution of the issues presented in *Russell*. *Barnes v. Hampton*, 198 Neb. 151, 152, 252 N.W.2d 138, 139 (1977), also a law action, refers to the matter in less specific language as the "limitation period provided in" the statute. *Farmers Union Co-op Assn. v. Mid-States Constr. Co.*, 212 Neb. 147, 151, 322 N.W.2d 373, 376 (1982), by reference to other authorities, characterizes the statute as affecting the " '*incapacity* to sue or be sued.' " (Emphasis supplied.) Discussing the statute in terms of the capacity to sue appears to characterize it as one of survival.

We have held that in the absence of a statutory provision to the contrary, no action at law can be maintained by or against a dissolved corporation as a body corporate or in its corporate name. *Christensen v. Boss*, 179 Neb. 429, 138 N.W.2d 716 (1965). We also quoted therein other authorities which hold that

where a statute continues the existence of a corporation for a certain period after its dissolution for purposes of defending and prosecuting suits, no action can be maintained by or against it after the expiration of that period. In other words, while a statute of limitations relates to the remedy only and not to substantive rights, *Denver Wood Products Co. v. Frye*, 202 Neb. 286, 275 N.W.2d 67 (1979), a survival statute operates on the right or claim itself.

The language in *Russell* which characterizes § 21-20,104 as a statute of limitations rather than one of survival is disapproved, as is any such suggestion which may be contained in *Hampton*.

Section 21-20,104 is a survival statute which destroys the capacity of former shareholders of a dissolved corporation to sue or be sued on rights entirely dependent upon and existing solely as an outgrowth of the shareholder status except within 2 years after the corporation has been dissolved.

Accordingly, the decree of the district court is reversed and the cause remanded for dismissal.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.

SHANAHAN, J., concurs in the result.