TIMOTHY D. KRACL AND LAURIE A. KRACL, HUSBAND AND WIFE, APPELLEES, V. NORMAN L. LOSEKE AND MARIE LOSEKE, HUSBAND AND WIFE, APPELLANTS.

461 N.W.2d 67

Filed October 5, 1990.   No. 88-532.

Stephen C. Hansen, of Luckey, Sipple, Hansen, Emerson & Schumacher, and Francis O'Brien for appellants.

Larry J. Karel, of Karel & Seckman, for appellees.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

In their petition filed on February 27, 1987, in the district court for Colfax County, Nebraska, Timothy D. and Laurie A. Kracl sought rescission of their written contract with Norman

L. and Marie Loseke for the purchase of Losekes' house and "for such other and further relief as is just and equitable . . . ." Kracls based their action on Losekes' concealment of termite damage in the residence sold to Kracls. The court entered judgment whereby the contract of sale was rescinded, Kracls recovered the payments made under the contract, and the premises were restored to Losekes, who appeal.

## STANDARD OF REVIEW

An action to rescind a written instrument is an equity action. *Fee v. Fee*, 223 Neb. 128, 388 N.W.2d 122 (1986) (rescission of farm lease); *Christopher v. Evans*, 219 Neb. 51, 361 N.W.2d 193 (1985) (rescission of contract for sale of residence).

> "In an appeal of an equity action, the Supreme Court tries factual questions de novo on the record and reaches a conclusion independent of the findings of the trial court, provided, where credible evidence is in conflict on a material issue of fact, the Supreme Court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another."

*Gottsch v. Bank of Stapleton*, 235 Neb. 816, 818, 458 N.W.2d 443, 446-47 (1990); *Frenzen v. Taylor*, 232 Neb. 41, 439 N.W.2d 473 (1989); Neb. Rev. Stat. § 25-1925 (Reissue 1989) (appellate review in equity cases).

## SALE OF LOSEKES' RESIDENCE

In December 1983, Losekes decided to sell their residence in Schuyler, Nebraska. Subsequently, in February 1984, Norman Loseke observed "tunnels on the south wall" of the residence's basement, but never actually saw termites in that area. Before putting their house on the market, Losekes had their basement ceiling "Sheetrocked" to cover floor joists which supported the first floor of their home. Most of the Sheetrock work, except for an area near the basement's north wall, was performed by Leo McNally in March 1984. The ceiling near the north wall was already Sheetrocked when McNally commenced his work. Prior to McNally's work for Losekes, a contractor had built a small room in the Loseke basement. The basement room was approximately 4 by 6 feet, with a fully Sheetrocked ceiling

which left no exposed wood. The walls for this basement addition also provided support for weakened joists covered by the Sheetrock at the north side of the basement. The additional support for the floor joists was necessary because, as later expressed by Norman Loseke at trial, "the floor joists were showing some deterioration, wood rot, termites . . . ."

The Kracls first viewed the Loseke residence in early April 1984 and were informed by Losekes that "the sheetrocking had been put up to help sell the property, spruce it up a little bit." Also, Norman Loseke told Kracls that the house was in "good condition." There was no discussion concerning termites. Norman Loseke never mentioned the "tunnels," since, as he later maintained, he did not realize that termites had made the tunnels at the basement's south side. Norman Loseke characterized the basement room as a "canning room" and did not indicate that the room supplied support for the floor joists and basement ceiling.

After an additional visit to the Loseke house, Kracls decided to purchase the residence and met with the Losekes on April 14, 1984, to review a "Contract for Sale of Real Estate" which Losekes provided. Paragraphs 7 and 8 of the contract state:

7. The buyer has examined the above described premises, and relies upon their own inspection of said premises, and not upon any representations made by the seller or agent of the seller. No warranty is implied or expressed by the seller.

8. Termite inspection of the above described premises shall be the responsibility of the buyers with regard to the making of arrangements for the inspection and for the payment of the costs of the inspection. If termites are found on the premises as a result of the inspection prior to the final settlement, costs incurred in the treatment for termites shall be the responsibility of the seller.

Kracls and Losekes signed the contract on April 14 and scheduled a closing for July 1. Under the contract, Losekes were allowed to remain in possession of the house until February 1, 1985, since they were in the process of building a new home. After the July closing, Losekes remained in the house until January 3, 1985. For that period, Losekes paid

Kracls rent in the amount of $1,000.

Although the Kracl-Loseke contract provided that Kracls were responsible for any termite inspection, Losekes took it upon themselves to obtain a termite inspection by Orkin Exterminating Company on October 17, 1984. That inspection revealed termites in the garage and beneath the basement steps of the house sold to Kracls. After Losekes paid for Orkin's treatment of the house, Norman Loseke told Kracls that Orkin "had found a trace [of termite activity] in the garage but there was nothing to worry about, they just went ahead and treated the house anyway."

### KRACLS' POSSESSION OF THE RESIDENCE

On January 3, 1985, Kracls moved into the former Loseke residence and, in October, replaced the old furnace in the north part of the basement, which required removing a section of the Sheetrock ceiling. When the Sheetrock was removed above the furnace, Kracls saw termite damage to the wooden floor joists. Kracls removed the remaining Sheetrock from the ceiling and found additional termite damage in the south and west ends of the basement. The bulk of the damage, however, was located in the north end of the basement. Orkin was summoned for the termite problem, treated the house in 1985, and applied an additional treatment in October 1986 to prevent further termite damage. Although the exact date is undisclosed, Kracls employed Joe Scheppers, a contractor, to inspect the house and evaluate the damage to their home. On January 12, 1987, Kracls received a written estimate from Scheppers Construction which stated that the cost to repair termite damage was $24,000. Kracls were also informed that it would cost an additional $1,000 for a moving company to raise the house so that Scheppers could replace the floor joists. To replace the floor joists, it would be necessary to remove and later replace the house's chimney at a cost of $1,700.

On January 30, 1987, Kracls, by a letter from their lawyer, first informed Losekes about Kracls' discovery of termite damage in the house. Kracls filed their rescission action on February 27 and alleged that Losekes had concealed the existence of termites in the house sold to Kracls, who would not

have purchased the house if the presence of termites had been known by Kracls.

In their answer of March 27, 1987, Losekes denied any fraudulent concealment and, on January 25, 1988, 2 days before trial, filed an amended answer, which contained:

> By way of further answer to Plaintiffs Petition Defendants allege[:] That the first time that either of Defendants were advised by Plaintiffs that they should be liable for any damage to the house they sold to Plaintiffs was during January of 1987, which was more than two years after Plaintiffs first occupied the house; consequently, Plaintiffs should be estopped from claiming any alleged misrepresentation by Defendants and from seeking recovery thereon.

Richard Kolarik, the Orkin employee who treated the house in response to Kracls' call, testified that the damage to the floor joists had "all been done by termites" and, regarding the north end of the basement, the damage was "very severe," especially since termites usually "don't eat a whole chunk" out of wood as the termites had done in Kracls' home. Kolarik estimated that it had taken termites at least 3 years to cause the damage to the floor joists that he viewed in October 1985. Kolarik also testified, without objection, that at the time the Sheetrock was installed in 1984, termite damage to the joists would have been visible. According to Robert Stratman, one of the Orkin employees who inspected the house for Losekes, covering the basement ceiling with Sheetrock rendered the termite damage undetectable. When questioned whether he had known about any termite damage in 1984 near the north basement wall, Norman Loseke testified that he had never looked at the area of the north wall, despite the fact that he had lived in the house for 30 years and twice a year had changed the filter for the furnace, which was located 1 foot from the north wall. McNally, who had done the Sheetrock work in the basement of the Loseke residence, testified that he never actually saw any termites when he installed the Sheetrock, but there "might have been a little tunnel or something on the south side" of the basement.

The court found generally in favor of Kracls, entered judgment that the Kracl-Loseke contract was rescinded, and

ordered Losekes to repay Kracls $56,358.05 which had been paid under the contract of sale.

## LOSEKES' ASSIGNED ERRORS

Losekes contend that (1) Kracls did not prove fraud in the form of Losekes' concealment of a material fact concerning the sale, (2) Kracls' failure to promptly rescind the contract prevents rescission, and (3) Losekes were entitled to rent from Kracls as a result of Kracls' possession of the premises before the rescission.

## FRAUD BY CONCEALMENT

In an equity case, fraud must be proven by clear and convincing evidence. *Bock v. Bank of Bellevue*, 230 Neb. 908, 434 N.W.2d 310 (1989). Fraud may be proved by circumstantial evidence. *J. L. Brock Bldrs., Inc. v. Dahlbeck*, 223 Neb. 493, 391 N.W.2d 110 (1986); *Alliance Nat. Bank v. State Surety Co.*, 223 Neb. 403, 390 N.W.2d 487 (1986). A seller's fraud provides a basis for a purchaser's right to rescind a contract for the sale of real estate. See *Christopher v. Evans*, 219 Neb. 51, 361 N.W.2d 193 (1985).

> [I]n order to maintain an action for damages for fraudulent concealment in the vendor/purchaser setting, the plaintiff must allege and prove by a preponderance of the evidence the following elements: (1) that the defendant concealed or suppressed a material fact; (2) that the defendant had knowledge of this material fact; (3) that this material fact was not within the reasonably diligent attention, observation, and judgment of the plaintiff; (4) that the defendant suppressed or concealed this fact with the intention that the plaintiff be misled as to the true condition of the property; (5) that the plaintiff was reasonably so misled; and (6) that the plaintiff suffered damage as a result.

*Nelson v. Cheney*, 224 Neb. 756, 762, 401 N.W.2d 472, 476-77 (1987).

In *Christopher v. Evans, supra* at 55, 361 N.W.2d at 196, which was a rescission action involving a contract for the sale of a residence, we stated:

> *Conceal* means "To hide, secrete, or withhold from the

knowledge of others. To withdraw from observation; to withhold from utterance or declaration; to cover or keep from sight. To hide or withdraw from observation, cover or keep from sight, or prevent discovery of." Black's Law Dictionary 261 (5th ed. 1979).

Also, in *Christopher, supra* at 54-55, 361 N.W.2d at 196, we recognized that fraud by concealment and fraud by misrepresentation are quite similar and acknowledged:

" 'If, with the intent to deceive, either party to a contract of sale conceals or suppresses a material fact, which he is in good faith bound to disclose, this is evidence of and equivalent to a false representation, because the concealment or suppression is in effect a representation that what is disclosed is the whole truth. The gist of the action is fraudulently producing a false impression upon the mind of the other party . . . .' "

(Quoting *Linton v. Sheldon*, 98 Neb. 834, 154 N.W. 724 (1915).)

In view of the severity and longevity of the termite damage in the basement of the Loseke residence, the reasonable conclusion is that Losekes knew about the presence of termites in the basement. Uncontradicted testimony established that the termite damage began some 3 years before the Orkin inspection in 1985, and, therefore, was visible well in advance of Losekes' sale to Kracls. Also undisputed is the fact that the termite damage was observable in 1984 when the Losekes placed Sheetrock on the basement ceiling, covering the floor joists, to help "spruce up" the house for a prospective sale. Although Norman Loseke claims that he never looked at the joists near the north basement wall, where he would have seen the termite problem, Loseke on several occasions was in the immediate vicinity of the termite damage when he changed the furnace filters. We also take into consideration the fact that the district court observed the various witnesses during their testimony and had a personal opportunity to evaluate the credibility of the witnesses. Losekes' activity in covering the joists with Sheetrock to mask the termite damage certainly comes within the definition of "concealment" in reference to fraud. See *Christopher v. Evans, supra.* After our de novo review of the

record, we reach the same conclusion as that of the district court, namely, Kracls proved their case of fraud by Losekes' concealment of the termite problem.

## LOSEKES' DEFENSES TO RESCISSION

Losekes contend that rescission is unavailable to Kracls because Kracls did not declare a rescission and tender the premises before commencement of the rescission action and did not timely elect to rescind the contract after discovery of the termite problem.

*Failure to Tender Property.*

To support their argument that a declaration of rescission and tender of property are necessary to maintain a rescission action, Losekes rely on *Rasmussen v. Hungerford Potato Growers Ass'n*, 111 Neb. 58, 62, 195 N.W. 469, 471 (1923), in which this court stated that

> he who rescinds must act promptly. Immediately upon learning the facts he should announce to his adversary that he does not intend to be bound by the terms of the agreement made, and tender back what he has received under it. *To maintain rescission at law*, he must do this at or prior to the time of the commencement of his action. Due allegation of his acts of rescission should be made in the petition.

(Emphasis supplied.) Losekes have confused rescission at law, which was involved in *Rasmussen*, and equitable rescission, which is the subject of the present appeal.

The difference between rescission at law and rescission in equity was explained by this court in *Haumont v. Security State Bank*, 220 Neb. 809, 815-16, 374 N.W.2d 2, 7 (1985):

> "Strictly speaking, in a law case, the rescission is by act of the party and is a condition precedent to bringing an action to recover money or thing owing to him by any other party to the contract as a consequence of the rescission, and by his rescission or repudiation of a contract a party merely gives notice to the other party that he does not propose to be bound by the contract. A court of law entertains an action for the recovery of the possession of chattels, or, under some circumstances, for

the recovery of land, or for the recovery of damages, and although nothing is said concerning it either in the pleading or in the judgment, a contract or conveyance, as the case may be, is virtually rescinded; the recovery is based on the fact of such rescission and could not have been granted unless the rescission had taken place.

"In equity, on the other hand, the rescission is effected by the decree of the equity court which entertains the action for the express purpose of rescinding the contract and rendering a decree granting such relief. In other words, a court of equity grants rescission or cancellation, and its decree wipes out the instrument, and renders it as though it does not exist."

(Quoting 12A C.J.S. *Cancellation of Inst.* § 4 (1980).)

Thus, a plaintiff's restitution or tender of property is unnecessary before commencement of an action in equity to rescind a contract or conveyance. *Haumont v. Security State Bank, supra*; *Geise v. Yarter*, 112 Neb. 44, 198 N.W. 359 (1924). As further observed in D. Dobbs, Handbook on the Law of Remedies, *Principles of Restitution* § 4.8 at 294 (1973):

In equity the suit is not *on* rescission, but *for* rescission; it is not a suit based upon the rescission already accomplished by the plaintiff, but a suit to have the court decree a rescission. . . . Since rescission is not accomplished "in equity" until the court so decrees, the plaintiff has no obligation before suit to make restitution of goods or money he received from the defendant. . . .

This does not mean that the plaintiff is entitled to get back what he gave and keep what he got, too. It means only that he need not make formal tender before suit.

See, also, *Knaebel v. Heiner*, 663 P.2d 551 (Alaska 1983) (because plaintiff sought equitable rescission rather than legal rescission, neither restoration nor tender was required prior to suit by plaintiff); *Lightner v. Karnatz*, 258 Mich. 74, 77, 241 N.W. 841, 842 (1932): "Restoration or tender before suit is a necessary element in legal rescission, but is wholly superfluous as a prerequisite to the commencement of a suit in equity for rescission or cancellation."

Because Kracls' case involves equitable rescission, that is, an

action to obtain a decree of rescission, Kracls' tender of the premises before filing their petition was unnecessary to preserve their cause of action for rescission of the contract with Losekes.

*Delay or Waiver by Kracls.*

Losekes further contend that the remedy of rescission is barred by the lapse of time in the present case or that the right to a rescission was waived because Kracls made improvements to the house after their discovery of the termite problem. Kracls discovered the termite damage in October 1985, received estimates of repair in January 1987, and filed suit in February 1987.

> "If the purchaser has knowledge of the grounds upon which he is entitled to rescind, an unreasonable delay upon his part, especially if accompanied by such change of circumstances as makes it impracticable for him to place the vendor in statu quo, or by such acts or conduct on the part of the purchaser as constitutes waiver, prevents him from exercising his right to rescind. Even where time is not of the essence of the contract, a purchaser may still lose his right to rescind by delaying action to a time, which, under the circumstances, is unreasonable." . . .
>
> "The question whether laches exists in a particular case depends upon its own peculiar circumstances . . . ."

*Russo v. Williams,* 160 Neb. 564, 582, 71 N.W.2d 131, 143-44 (1955).

In determining whether a purchaser's delay in seeking rescission is unreasonable, we must keep in mind that "the defense of laches is not favored in Nebraska. It will be sustained only if a litigant has been guilty of inexcusable neglect in enforcing a right to the prejudice of his adversary." *In re Estate of Widger,* 235 Neb. 179, 181, 454 N.W.2d 493, 496 (1990). Similarly, we have stated that "laches does not result from the mere passage of time, but from the fact that during the lapse of time, circumstances changed such that to enforce the claim would work inequitably to the disadvantage or prejudice of another." *Van Pelt v. Greathouse,* 219 Neb. 478, 484, 364 N.W.2d 14, 19 (1985).

Losekes direct our attention to *Russo v. Williams, supra,*

where Russos were denied rescission even though their delay in seeking rescission was much shorter than the time element in Kracls' case. In *Russo*, Russos purchased a motel, consisting of several units, and took possession on April 22, 1952. Around June 26, Russos discovered termites on the premises and sued for rescission in early September 1952 after discovery of additional termites. In concluding that Russos' delay in seeking rescission was unreasonable, this court pointed out that after the discovery of termites in June, Russos "made no effort to eradicate or control them, although the evidence shows that can be done." *Id.* at 583, 71 N.W.2d at 144. This court also noted that Russos continued to operate the motel after the initial discovery of termites and that

> [i]t was only after [Russos] discovered additional evidence of termites in several of the cabins in the early part of September 1952 that they took action. This was after the tourist season of 1952 was practically over. It is apparent the business had not been as profitable as appellants had anticipated and so, when they found this additional evidence of termites, they decided it was a good time to give the motel back to [Williams].

*Id.* The *Russo* court concluded: "Under these circumstances we do not think appellants are entitled to rescind. They should have acted when they first discovered the place had termites and therefore [was] not as represented. By waiting until September we find they affirmed the contract and that rescission should be denied." *Id.* Thus, in *Russo*, the court did not determine that the length of delay or the time element, from June to September, in and of itself was unreasonable; rather, Russos' actions during that period "affirmed" the contract and, thus, barred Russos from rescission. Furthermore, in *Russo*, the defendant seller suffered prejudice from Russos' failure to take any steps to prevent additional termite damage after the initial discovery of the termite problem.

In the present appeal, although Kracls did not file suit until approximately 16 months after their discovery of the termite problem, nothing indicates that Losekes sustained any prejudice during the interval between Kracls' discovery and commencement of the suit. In efforts to ascertain the extent of

termite damage, Kracls enlisted the services of a contractor to examine the house and provide information about the magnitude of the termite damage as a factor in intelligently determining the course of action to be taken. The premises did not suffer any additional termite damage during the postdiscovery period before suit was filed. In fact, Kracls reasonably took the precaution of additional termite treatment to prevent further damage. Also, Richard Kolarik testified that, in terms of termite damage, the condition of the floor joists at the time of trial was identical to the joists' condition at the time Kracls discovered the termite problem, which indicates that the termite problem was ostensibly stabilized as the result of Kracls' discovery and intervention. We conclude that any delay by Kracls did not constitute "inexcusable neglect," see *In re Estate of Widger, supra*, to bar Kracls' rescission of their contract with Losekes.

Losekes also argue that the right to rescission was waived by Kracls because Kracls made improvements on the house.

A purchaser's conduct which constitutes acquiescence, ratification, or estoppel precludes rescission of a contract. *Wolin v. Zenith Homes, Inc.*, 219 Md. 242, 146 A.2d 197 (1959). Cf. *Wegner v. West*, 169 Neb. 546, 552, 100 N.W.2d 542, 547 (1960): " 'The assertion of the rescission of a contract is nullified by the subsequent acceptance of benefits growing out of the contract claimed to have been rescinded.' "

The "improvements" by Kracls after discovery of the termite problem consist of roof repair, $56.89; repair of a water pipe, $3.50; pump repair, $11.89; and repair to a door, $21.60, a total of $93.88 in repairs. These minor repairs can hardly be considered acts which indicate Kracls' intent to ratify the contract with Losekes or acquiesce in the termite damage. The repairs by Kracls show nothing more than a wish to preserve the status of the property or to protect the property from further deterioration. Thus, we conclude that Kracls' right to a rescission is not barred by the equitable defenses asserted by Losekes.

## LOSEKES' RECOVERY OF RENT

Losekes argue that the trial court erred in not deducting from

Kracls' recovery the reasonable rental value of the premises while Kracls occupied the house. Losekes did not plead fair rental value as a setoff or counterclaim in the action commenced by Kracls.

In *Boris v. Heyd*, 220 Neb. 569, 371 N.W.2d 268 (1985), Boris commenced an action for strict foreclosure of a land contract with Heyds, who counterclaimed based on the seller's fraud. Boris generally denied the alleged fraud. Heyds obtained a rescission of the contract, subject to a setoff in Boris' favor for rent while Heyds occupied the premises under the contract. In *Boris*, we reversed the setoff for rent and stated:

> The fact question as to what would be the reasonable rental value of the property was neither pled nor proved. Since no evidence as to fair rental value appears in the record at any point, a setoff for fair rental value could be based only on conjecture or speculation. . . . Furthermore, plaintiff was required by Neb. Rev. Stat. §§ 25-811 and 25-812 (Reissue 1979) to plead the setoff in her response to the Heyds' counterclaim. No such pleading was filed. The setoff . . . must be disallowed.

220 Neb. at 572-73, 371 N.W.2d at 270-71.

Notwithstanding *Boris*, we have recognized that the purpose of rescission is to place the parties in a status quo, that is, return the parties to their position which existed before the rescinded contract; hence, rescission may be unavailable unless the parties can be placed substantially in the status quo. See, *Anson v. Grace*, 174 Neb. 258, 117 N.W.2d 529 (1962); *Wegner v. West, supra*; *Caruso v. Moy*, 164 Neb. 68, 81 N.W.2d 826 (1957); *Russo v. Williams*, 160 Neb. 564, 71 N.W.2d 131 (1955). See, also, *Perry v. Meyer*, 110 Neb. 347, 350-51, 193 N.W. 717, 718 (1923): "The principal relief effected by rescission is to place the parties in the same condition as they were in before the making of the contract sought to be rescinded"; *Collison v. Ream*, 95 Neb. 29, 38, 144 N.W. 1050, 1053 (1914): "When a contract is rescinded, parties should be placed in *statu quo* as nearly as possible."

Thus, the remedy of rescission involves more than cancellation of a contract, and includes a judicial effort to place the contractual parties in, as nearly as possible, substantially

the same condition which existed when the contract was entered. The equitable objective of a return to the status quo as the result of a rescission is consistent with the equitable maxim "[One] who seeks equity must do equity." *Campbell v. Ohio National Life Ins. Co.*, 161 Neb. 653, 674, 74 N.W.2d 546, 559 (1956); *Hadley v. Platte Valley Cattle Co.*, 143 Neb. 482, 10 N.W.2d 249 (1943). The meaning of the foregoing maxim is that

"whatever be the nature of the controversy between two definite parties, and whatever be the nature of the remedy demanded, the court will not confer its equitable relief upon the party seeking its interposition and aid, unless he has acknowledged and conceded or will admit and provide for, all the equitable rights, claims and demands justly belonging to the adversary party, and growing out of or necessarily involved in the subject matter of the controversy."

*Kerr v. McCreary*, 84 Neb. 315, 320, 120 N.W. 1117, 1119-20 (1909).

The equitable objective in a return to the status quo as a result of rescission and the reasonable rental value for property involved in the rescission have been considered by numerous courts. For example, in *Smeekens v. Bertrand*, 262 Ind. 50, 311 N.E.2d 431 (1974), the Supreme Court of Indiana recognized:

It is hornbook law that a rescinding party must restore any and all benefits received under the contract. The parties must be returned to the status quo. . . . "Therefore, when a party elects to rescind the contract, he is only entitled to a return to the status quo. This usually requires a plaintiff to restore *any benefit* he received under the contract, *including a return in specie of any property received and a reasonable rental value for the use of the property*, plus damages for waste, if any. Likewise, *the defendant must restore any money paid by the plaintiff under the contract plus interest . . . .*"

(Emphasis in original.) *Id.* at 58, 311 N.E.2d at 436 (quoting *Grissom v. Moran*, 154 Ind. App. 432, 292 N.E.2d 627 (1973)). See, also, *Renner v. Kehl*, 150 Ariz. 94, 98, 722 P.2d 262, 266 (1986): " '[I]t is of course essential to justify the rescinding of a contract that the rescinding party offer to place the other in

status quo, and this includes the offer to credit the vendors with a reasonable rental value for the time during which the land was occupied' "; *Walter v. Moore*, 700 P.2d 1219 (Wyo. 1985) (defendant vendor entitled to reasonable rental value of home, since plaintiff successfully obtained rescission of contract for sale of home); *Isaacs v. Bokor*, 566 S.W.2d 532, 540 (Tenn. 1978): "[I]n attempting to restore the parties to their former status, courts may require the vendee to account to the vendor for the use or rental value of the property"; *Farmer v. Groves*, 276 Or. 563, 568, 555 P.2d 1252, 1255 (1976): "In the case of a rescission plaintiffs are entitled to be returned to the status quo and to recover the payments made on the contract less the fair rental value of the premises for the time they had possession thereof"; *Nelson v. Hoff*, 70 Idaho 354, 360, 218 P.2d 345, 349 (1950): "It is true that respondents did not raise the question of rental value by cross-complaint. However, it was the duty of appellants to account for the reasonable rental value, if any, of the property in the event they were entitled to recover." We, therefore, hold that in equitable rescission of a real estate contract, a plaintiff purchaser is entitled to be returned to the status quo and recover payments on the contract rescinded, less the fair rental value of the premises for the time that the plaintiff held possession of the premises under the contract. For that reason, we now disapprove of the holding in *Boris v. Heyd*, 220 Neb. 569, 371 N.W.2d 268 (1985), which requires that a defendant vendor plead a setoff for rent on the premises before the vendor is entitled to a credit against contract payments recovered by the plaintiff purchaser in an equity action for rescission of a contract for the sale of real estate.

In the appeal before us, Kracls sought the equitable remedy of rescission concerning their contract with Losekes. By seeking an equitable remedy, Kracls rendered themselves amenable to doing equity in accordance with the maxim "One who seeks equity must do equity." Consequently, in Kracls' action, the district court was obliged to provide equitable relief and direct whatever was reasonably necessary to return Kracls and Losekes to their respective positions, the status quo, which existed immediately before the parties entered their contract for sale and purchase of the Loseke house. After the contract,

Kracls had possession of the house until they elected to seek rescission of the contract by which they held possession. Since Kracls could not accomplish the impossible by turning back the calendar and restoring the time which had elapsed during their possession of the property, an equitable solution includes consideration of reasonable rent for the period while Kracls were in possession of the premises. Thus, although Losekes did not plead a setoff for reasonable or fair rental value of the property while Kracls were in possession of the premises, equitable relief through rescission, as an effort to reestablish the status quo which existed when the parties entered the contract, may necessitate that Kracls pay Losekes the fair rental value during Kracls' possession of the premises.

However, before a seller, as a party to a contract rescinded in an equity action, may receive credit for fair rental value of the premises involved in the rescission action and thereby reduce the amount recoverable by the plaintiff purchaser as a result of the rescission, a court must be presented with relevant evidence which establishes the fair rental value of the premises. We find, as the district court obviously found, that the payments by Losekes while they were in possession of the house after execution of the Kracl contract occurred as special circumstances in the sale and, therefore, lack probative value to establish the fair rental value for the premises. Thus, there is no relevant evidence which warrants an adjustment of the amount awarded to Kracls, namely, $56,358.05 paid under the contract, as equitable relief under the circumstances.

The judgment of the district court is affirmed.

AFFIRMED.

FAHRNBRUCH, J., concurring in the result.

I agree not only with the result reached in the majority opinion, but also with the holding that in an equitable action for rescission of the sale of the property, a purchaser seeking the rescission is liable for the fair rental value of the property during the purchaser's possession. I would, however, require the vendor not only to plead, but also to assume the burden of proving, the fair rental value of the property while it was in the purchaser's possession.

Nebraska adheres to the doctrine of code pleading. Under

that doctrine, the purpose of pleadings is to frame issues upon which a cause is to be tried, and issues in a given case are limited to those which are pleaded. *Circle 76 Fertilizer v. Nelsen*, 219 Neb. 661, 365 N.W.2d 460 (1985). One of the purposes of a pleading is to advise an adversary as to what issue the adversary must meet. *Bashus v. Turner*, 218 Neb. 17, 352 N.W.2d 161 (1984).

If the vendor in an equitable action for rescission fails to either plead or prove the fair rental value of the property during the purchaser's possession, the issue of fair rental value should not be considered by the court.

WHITE and GRANT, JJ., join in this concurrence.